# United States Court of Appeals
# for the Federal Circuit

---

**BRUCE R. TAYLOR,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF VETER-ANS AFFAIRS,**
*Respondent-Appellee*

---

2019-2211

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 17-2390, Judge Joseph L. Falvey Jr., Judge William S. Greenberg, Judge Amanda L. Meredith.

---

Decided: June 15, 2023

---

CHARLES MCCLOUD, Williams & Connolly LLP, Washington, DC, argued for claimant-appellant. Also represented by DEBMALLO SHAYON GHOSH, ANNA JOHNS HROM, LIAM JAMES MONTGOMERY, TIMOTHY M. PELLEGRINO; MARK B. JONES, Mark B. Jones Attorney at Law, Sandpoint, ID.

WILLIAM JAMES GRIMALDI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M.

MCCARTHY, LOREN MISHA PREHEIM; CHRISTOPHER O. ADELOYE, BRIAN D. GRIFFIN, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

DROR LADIN, American Civil Liberties Union Foundation, New York, NY, for amici curiae American Civil Liberties Union, American Civil Liberties Union of the District of Columbia. Also represented by BRETT MAX KAUFMAN; SCOTT MICHELMAN, ARTHUR B. SPITZER, ACLU Foundation of the District of Columbia, Washington, DC.

GLENN R. BERGMANN, Bergmann Moore, LLC, Bethesda, MD, for amicus curiae American Legion. Also represented by THOMAS POLSENO, JAMES DANIEL RIDGWAY.

MELANIE L. BOSTWICK, Orrick, Herrington & Sutcliffe LLP, for amicus curiae Military-Veterans Advocacy Inc. Also represented by THOMAS MARK BONDY; ELIZABETH MOULTON, San Francisco, CA; JOHN B. WELLS, Law Office of John B. Wells, Slidell, LA.

ANGELA K. DRAKE, Veterans Clinic, University of Missouri School of Law, Columbia, MO, for amicus curiae National Law School Veterans Clinic Consortium.

JENNIFER SWAN, Dechert LLP, Palo Alto, CA, for amici curiae National Veterans Legal Services Program, Swords to Plowshares. Also represented by HOWARD W. LEVINE, Washington, DC; RENEE A. BURBANK, National Veterans Legal Services Program, Arlington, VA; EMILY WOODWARD DEUTSCH, Washington, DC.

---

Before MOORE, *Chief Judge*, NEWMAN, LOURIE, DYK, PROST, REYNA, WALLACH, TARANTO, CHEN, HUGHES, STOLL, CUNNINGHAM, and STARK, *Circuit Judges*.[1]

Opinion filed by *Circuit Judge* TARANTO, Parts I–IV of which constitute an opinion for the court. *Chief Judge* MOORE and *Circuit Judges* PROST, CHEN, STOLL, and CUNNINGHAM join in full; *Circuit Judges* LOURIE and HUGHES join Parts I–IV.

Opinion concurring in the judgment filed by *Circuit Judge* DYK, which *Circuit Judges* NEWMAN, REYNA, and WALLACH join in full and Parts I, II, and V of which *Circuit Judge* STARK joins.

Opinion dissenting in part and dissenting from the judgment filed by *Circuit Judge* HUGHES, which *Circuit Judge* LOURIE joins.

TARANTO, *Circuit Judge*.

During his service in the U.S. Army from 1969 to 1971, Bruce R. Taylor voluntarily participated as a test subject in a secret Army program, at the Edgewood Arsenal facility in Maryland, that assessed the effects of various dangerous substances, including chemical warfare agents. The government swore him to secrecy through an oath broadly requiring him not to reveal any information about the program to persons not authorized to receive it, without specifying who might be so authorized. Mr. Taylor suffered injuries from his participation in the program, resulting in disabilities. But as the government concedes, the secrecy oath, backed by the possibilities of court-martial and criminal penalties, caused Mr. Taylor to refrain, for more than three decades after his discharge from service, from pursuing the sole adjudicatory route to vindicate his statutory

---

[1]    Circuit Judge O'Malley retired on March 11, 2022.

entitlement to disability compensation for those service-connected disabilities. Specifically, he refrained from filing a claim with the Department of Veterans Affairs (VA) for compensation based on his Edgewood injuries until after the government, in 2006, released him and similarly situated veterans from their secrecy oaths.

In 2007, Mr. Taylor filed a claim for disability benefits, which VA granted. But VA granted the benefits only from the 2007 date of the claim because the governing statute, 38 U.S.C. § 5110, specifies that the earliest possible effective date (with some limited exceptions) is the date on which VA receives the veteran's claim. On appeal from an adverse decision of the United States Court of Appeals for Veterans Claims (Veterans Court), *Taylor v. Wilkie*, 31 Vet. App. 147 (2019) (*Taylor CAVC 2019*), Mr. Taylor argues that he was entitled to a much earlier effective date, as far back as one day after the day that he was discharged in 1971, because it was the government's threat of penalties for revealing information that for decades caused him not to file a claim to vindicate his legal entitlement to benefits.

Mr. Taylor relies first on the general doctrine of equitable estoppel to support his request. We conclude that application of that doctrine here is barred by the Supreme Court's decision in *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990), which held that courts may not rely on equitable estoppel to award money from the public fisc of the United States in violation of limitations established by statute. That substantive limit on the doctrine applies in any forum unless Congress has overridden *Richmond* for a particular context by statutorily providing for application of the general equitable estoppel principles to claims for money from the public fisc. Congress has not done so for the benefits setting here, so *Richmond* precludes reliance on equitable estoppel to override the claim-filing effective-date limits of § 5110, as we held in *McCay v. Brown*, 106 F.3d 1577 (Fed. Cir. 1997).

We also conclude that Mr. Taylor has not supported his new argument for relief based on 38 U.S.C. § 6303, which directs VA to provide certain information and assistance regarding potential benefits to veterans even before they file, or indicate an interest in filing, claims for benefits. Nothing in § 6303 purports to displace the *Richmond* limit on equitable estoppel. To the extent that Mr. Taylor argues that equitable estoppel might apply based on § 6303 even if Congress did not make compliance with § 6303 a precondition to enforcing § 5110's claim-filing effective-date requirements, he is incorrect. Applying equitable estoppel in those circumstances would violate *Richmond* because the monetary award would violate statutory limits. To the extent that Mr. Taylor argues that Congress made compliance with § 6303 a precondition to enforcing § 5110's claim-filing effective-date limits, he is also incorrect. That argument is contrary to precedent, *see Andrews v. Principi*, 351 F.3d 1134 (Fed. Cir. 2003); *Rodriguez v. West*, 189 F.3d 1351 (Fed. Cir. 1999), and Mr. Taylor has not asked us to overrule that precedent and there are strong reasons not to do so.

Although we thus find no equitable-doctrine or statutory basis to support Mr. Taylor's effort to obtain an effective date earlier than the date prescribed by § 5110, we agree with Mr. Taylor in his alternative argument that he is entitled under the Constitution to have the effective date of his benefits determined notwithstanding § 5110's claim-filing limits on the effective date. For decades, the government denied Mr. Taylor his fundamental constitutional right of access to the adjudication system of VA, the exclusive forum for securing his legal entitlement to the benefits at issue. The government's threat of court-martial or prosecution—without an exception for claims made to VA—affirmatively foreclosed meaningful access to the exclusive adjudicatory forum. And without questioning the strength of the interest in military secrecy, we see no adequate justification for this denial of access. The government makes

only highly general assertions of national-security interests, but it acknowledges that VA has created and uses special processes for adjudicating claims by former members of the special forces for injuries incurred during military operations whose existence remains classified, and the government has furnished no adequate reason that secrecy could not have been similarly protected for Edgewood veterans like Mr. Taylor.

For those reasons, which reach what we would expect to be a very rare set of circumstances, we hold that the claim-filing effective-date provisions of § 5110 are unconstitutional as applied to Mr. Taylor. A veteran in Mr. Taylor's position is entitled, under ordinary remedial principles, to receive benefits for service-connected disabilities from the effective date that the veteran would have had in the absence of the government's challenged conduct. We reverse the Veterans Court's decision and remand for expeditious proceedings to implement our holding.

I

A

Mr. Taylor served on active duty in the U.S. Army from January 1969 to March 1971. During his service, he volunteered to participate as a human subject in a testing program conducted at a U.S. Army facility in Edgewood, Maryland. The program—which was designed to study the effects of chemical warfare agents on the "ability [of the subjects] to function as soldiers," S. Rep. No. 94-755, Book I, at 412 (1976)—involved testing of "more than 250 different agents" and "at least 6,700 'soldier volunteers'" from 1955 to 1975, En Banc J.A. 35 [hereafter, simply J.A.].

When Mr. Taylor arrived at the Edgewood Arsenal facility in August 1969, he signed a consent form confirming that the experiment had been explained to him and that he "voluntarily agree[d] to participate." J.A. 31. Mr. Taylor also signed an oath prohibiting him from disclosing

information about the program under penalty of court-martial. Although a copy of the piece of paper Mr. Taylor signed is unavailable, the parties agree that Mr. Taylor signed such an oath and also agree on the content of the oath for purposes of this case. Sec'y En Banc Response Br. at 2–3. The Veterans Court also determined: "[N]or is there any dispute that [Mr. Taylor] signed an oath vowing not to disclose his participation in or any information about the study, under penalty of court[-]martial or prosecution." *Taylor CAVC 2019*, 31 Vet. App. at 149 (citing pages 10–11 of the record before the Veterans Court in 2019 (Vet. Ct. Rec.)). The government has not disputed that determination in this court.

Both Mr. Taylor and the government point us to a sample oath released by a committee of the U.S. Senate in 1976. *See* Taylor En Banc Opening Br. at 8 (citing S. Rep. No. 94-755, Book I, at 418); Sec'y En Banc Response Br. at 3 n.1 (citing same). The Board of Veterans' Appeals found that this sample oath was the oath that "most [Edgewood program] participants were required to sign" and used the sample oath in its analysis of Mr. Taylor's claim. *In re Taylor*, No. 08-13 206, 2017 WL 2498716, at *2, *4 (Bd. Vet. App. Apr. 14, 2017) (*Taylor BVA 2017*). The sample oath committed those who signed it "not [to] divulge or make available any information related to U.S. Army Intelligence Center interest or participation in the Department of the Army Medical Research Volunteer Program to any individual, nation, organization, business, association, or other group or entity, not officially authorized to receive such information." S. Rep. No. 94-755, Book I, at 418. Signatories also acknowledged that they "underst[oo]d that any action contrary to the provisions of this statement w[ould] render [them] liable to punishment under the provisions of the Uniform Code of Military Justice." *Id.*

The Veterans Court, in an earlier decision, found that Mr. Taylor was exposed at Edgewood to at least EA-3580 (an anticholinergic, a type of nerve agent that blocks the

transmission of the neurotransmitter acetylcholine), EA-3547 (a tear gas agent), and scopolamine (also an anticholinergic). *Taylor v. Shinseki*, No. 11-0254, 2013 WL 3283487, at *1 & nn.2–3 (Vet. App. June 28, 2013) (*Taylor CAVC 2013*) (citing Vet. Ct. Rec. at 134–35, 151, 438, 466, 469, 482–83); *see also* J.A. 31 (volunteer report memorializing the administration of EA-3580A to Mr. Taylor); J.A. 40 (psychological report showing Mr. Taylor's recall of having been "injected with large doses of [s]copolamine"). Mr. Taylor reported experiencing hallucinations after being administered agents being tested, such as, when on the rifle range, "thinking that he was killing people rather than shooting at targets." J.A. 57; *see also* J.A. 40 (reporting same).

After leaving Edgewood, Mr. Taylor served two tours in Vietnam, deploying in December 1969. *Taylor CAVC 2013*, 2013 WL 3283487, at *1 (citing Vet. Ct. Rec. at 438, 444). Mr. Taylor reported that, while in Vietnam, "he experienced flashbacks and insomnia, used marijuana and alcohol extensively," *id.* (citing Vet. Ct. Rec. at 384), and was "suicidal at times," J.A. 47. At one point, Mr. Taylor described his conditions to his platoon sergeant, who referred him to a service psychiatric office, where, he said, he "was treated like a liar and reprimanded." J.A. 46; *see also* J.A. 62. At another point, Mr. Taylor was reduced in rank after being "accused of sleeping [on] Guard Duty," J.A. 46–47; although Mr. Taylor recalled that during that particular Guard Duty he experienced "a major flashback" that prevented him from "hear[ing] anyone call [his] name," J.A. 46, his Edgewood oath "prevented [him] . . . from showing mitigating or extenuating circumstances during [the] court-martial," *Taylor CAVC 2013*, 2013 WL 3283487, at *1 (citing Vet. Ct. Rec. at 402–03, 454–55).

Mr. Taylor was honorably discharged on September 6, 1971. After discharge, Mr. Taylor "isolated himself" and "exhibit[ed] marked impairment in social and vocational functioning." J.A. 58, 62. He continued to experience

insomnia, nightmares, a depressed mood, and auditory hallucinations, all of which became more pronounced around 2000. Eventually, he sought treatment but, he said, was "turned away because the treating provider believed [that] his story about being an experimental subject [was] a fabrication." J.A. 58.

B

In 2006, the Department of Defense "declassified the names of the servicemen and women who had volunteered for the Edgewood Program." *Taylor CAVC 2019*, 31 Vet. App. at 149 (citing Vet. Ct. Rec. at 2695–97). On June 30 of that same year, VA sent letters to the Edgewood participants—including Mr. Taylor, *see* Sec'y En Banc Response Br. at 3—informing them that the Department of Defense "had given [them] permission . . . to disclose to health care providers information about their involvement in the Edgewood Program that affected their health," *Taylor CAVC 2019*, 31 Vet. App. at 149 (citing Vet. Ct. Rec. at 2695–97). "For example," the letter said, "you may discuss what you believe your exposure was at the time, reactions, treatment you sought or received, and the general location and time of the tests." J.A. 32. The letter also offered a VA clinical examination and advised: "[I]f you think that you suffer from chronic health problems as a result of these tests [conducted at Edgewood], contact VA . . . to speak to a VA representative about filing a disability claim." J.A. 33.

On February 22, 2007, Mr. Taylor filed a claim for benefits for posttraumatic stress disorder (PTSD) "caused in service in 1969 at the chemical research program at Edgewood." J.A. 38. A VA clinical examiner diagnosed Mr. Taylor with chronic PTSD and recurrent major depressive disorder, both of which the examiner "considered to be a cumulative response to [Mr. Taylor's] participation as a human subject in the Edgewood . . . experiments and subsequent re-traumatization in Vietnam." J.A. 62.

In July 2007, a VA regional office granted Mr. Taylor's benefits claim for PTSD and major depressive disorder, assigning a 70% rating and an effective date of February 28, 2007, the date that VA received Mr. Taylor's benefits claim. Later, in October of the same year, VA granted Mr. Taylor entitlement to a total disability rating based on individual unemployability, also with an effective date of February 28, 2007.

C

Mr. Taylor appealed to the Board of Veterans' Appeals, requesting "an effective date of September 7, 1971, the day following [his] discharge," because he "felt constrained from filing for VA benefits by [the] secrecy agreement[] until [he] received the VA letter" authorizing him to do so. J.A. 77–78. The government does not dispute the effect of Mr. Taylor's oath. The government accepts that "[t]he consequence of the oath was that Mr. Taylor refrained from seeking benefits until 2007." Sec'y En Banc Response Br. at 28; *see also id.* at 26 ("[A]lthough Mr. Taylor refrained from seeking benefits until 2007, his inaction was the consequence of . . . the secrecy oath.").

On July 20, 2010, the Board denied Mr. Taylor's request for an earlier effective date. *In re Taylor*, No. 08-13 206, 2010 WL 3537263 (Bd. Vet. App. July 20, 2010) (*Taylor BVA 2010*). The Board explained that, for claims like Mr. Taylor's, the effective date of an award of disability compensation is generally the later of the date that VA receives the claim or the date that entitlement arises—*i.e.,* the date that the service-connected disability begins. *Id.* at *1 (citing 38 U.S.C. § 5110; 38 C.F.R. § 3.400); *see* 38 U.S.C. § 5110(a)(1). Section 5110(b)(1), however, provides an exception: If VA receives the disability-compensation claim within one year of the date that the veteran was discharged, then the effective date is the day following the day of discharge. 38 U.S.C. § 5110(b)(1); *see* 38 C.F.R. § 3.400(b)(2)(i). The Board reasoned that, because Mr.

Taylor first filed his benefits claim in February 2007, "more than 30 years" after he was discharged, the § 5110(b)(1) exception does not apply, and the effective date cannot be earlier than February 28, 2007, the date that VA received his benefits application. *Taylor BVA 2010*, 2010 WL 3537263, at *1–2. Although the Board "[was] sympathetic" to Mr. Taylor's situation, it said that "there was nothing stopping [Mr. Taylor] from filing the claim with . . . VA earlier," that the Board was "bound by the law," and that it was "without authority to grant benefits on an equitable basis." *Id.* at *2–3.

Mr. Taylor appealed to the Veterans Court, arguing among other things that VA "denied his right to due process . . . by failing to have any process in place by which [he] could make a claim for [benefits] . . . as a former participant in the Edgewood program, prior to the 2006 partial [declassification]." J.A. 104. Citing *Christopher v. Harbury*, 536 U.S. 403 (2002), Mr. Taylor asserted that VA "must give [him] and all other Edgewood Veterans their right to access the VA system." J.A. 111. The Veterans Court, in a single-judge decision on June 28, 2013, vacated the Board's decision, stating that the Board's decision "le[ft] the Court unable to discern whether [Mr. Taylor] retained his eligibility to file for benefits while the oath was active." *Taylor CAVC 2013*, 2013 WL 3283487, at *2. The Veterans Court remanded for the Board to "obtain and account for the language of the secrecy oath," *id.*, and the Board in turn remanded to VA, *In re Taylor*, No. 08-13 206, 2014 WL 1417924 (Bd. Vet. App. Feb. 27, 2014).

VA "attempted to obtain [the oath] directly from . . . Edgewood . . . but failed to receive a response." *Taylor BVA 2017*, 2017 WL 2498716, at *2; *see also Vietnam Veterans of America v. Central Intelligence Agency*, 288 F.R.D. 192, 198 (N.D. Cal. 2012) ("Defendants have been unable to locate written secrecy oaths administered during WWII or the Cold War."). Therefore, VA relied on the sample oath we have quoted, which the Board also found was the oath

that "most [Edgewood] participants were required to sign," *Taylor BVA 2017*, 2017 WL 2498716, at *2, and which has been accepted as Mr. Taylor's oath throughout the remaining litigation.

With that oath in hand, the Board again denied Mr. Taylor's request for an earlier effective date, identifying three reasons for its decision. *Id.* at *3–6. First, Mr. Taylor's "diagnosis of PTSD is based on multiple stressors, including witnessing the death of [a fellow soldier]" in Vietnam, and "nothing prevented [Mr. Taylor] from filing a claim for PTSD based on those [Vietnam] stressors without having to divulge any information regarding the Edgewood experiments." *Id.* at *4. Second, Mr. Taylor "appears to have divulged information regarding the Edgewood experiments despite the secrecy oath" during his attempts to seek treatment, so he "cannot now claim that [the oath] prevented him from filing a claim for benefits." *Id.* at *5. "Third, most importantly, and, in fact, dispositive to the outcome of the instant case," the Board said, "the governing statute . . . [§ 5110] does not allow for equitable tolling." *Id.* *See generally Arellano v. McDonough*, 143 S. Ct. 543, 547 (2023) (explaining that equitable tolling "pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action").

Mr. Taylor again appealed to the Veterans Court, and on April 5, 2019, a panel affirmed the Board's decision over the dissent of Judge Greenberg. *Taylor CAVC 2019*, 31 Vet. App. 147. The majority rejected Mr. Taylor's procedural due process argument, reasoning that he "cite[d] no authority that establishes that a person has a property right in disability benefits *before* a claim is filed." *Id.* at 152. The majority also agreed with the Board that § 5110 is not subject to equitable tolling. *Id.* at 154–55 (citing, among other authorities, *Andrews*, 351 F.3d at 1137–38, and *Rodriguez*, 189 F.3d at 1355). The majority further declined to apply the distinct doctrine of equitable estoppel

at least because this court in *McCay*, relying on the Supreme Court's decision in *Richmond*, "held that [the Veterans Court] cannot use equitable estoppel to authorize payment outside of the requirements set out in section 5110." *Id.* at 154 n.4 (citing 106 F.3d at 1581). The majority concluded that § 5110 "is clear" in this case: "The effective date for the award of benefits is the date of the claim." *Id.* at 155.

Judge Greenberg, dissenting, would have reversed the Board. *Id.* at 155–62. First, he said, "the Board's finding that the appellant could have filed for PTSD-related benefits for his service in Vietnam without divulging information related to the Edgewood experiments" is "error" because "[t]he Board does not possess the medical expertise to determine that a veteran is capable of untangling stressor events, especially not when a medical examiner" found that Mr. Taylor's conditions are "a cumulative response to his participation as a human subject in the Edgewood Arsenal experiments and subsequent retraumatization in Vietnam." *Id.* at 157–58 (quoting Vet. Ct. Rec. at 2311 (J.A. 62)). Second, Judge Greenberg continued, "the fact that [Mr. Taylor] divulged his [Edgewood] participation for the purposes of treatment has no bearing" on whether the oath prevented him from filing a disability claim with VA because "[f]iling a claim for benefits with the [g]overnment under a cloud of prosecution is a wholly different proposition from divulging information to a medical provider." *Id.* at 158. Third, Judge Greenberg concluded, VA and the Board should be "equitably estopped from finding that [Mr. Taylor] filed a claim after" September 7, 1971, because the government "waited more than thirty years to recognize [Mr. Taylor's] participation" at Edgewood. *Id.* 161–62 (emphasis omitted).

## D

Mr. Taylor timely appealed to this court, invoking our jurisdiction under 38 U.S.C. § 7292. On June 30, 2021, a

panel reversed the Veterans Court's decision, concluding that the Veterans Court had the authority to equitably estop the government in this case and that Mr. Taylor is entitled, on this record, to have the government equitably estopped "from asserting" the claim-filing effective-date limitation of "38 U.S.C. § 5110(a)(1) against [his] claim." *Taylor v. McDonough*, 3 F.4th 1351, 1372–73 (Fed. Cir. 2021). We sua sponte vacated the panel opinion and ordered the case reheard en banc, with additional briefing on equitable estoppel and on the constitutional right of access to courts and other forums for redress. *Taylor v. McDonough*, 4 F.4th 1381 (Fed. Cir. 2021) (en banc) (per curiam). After receiving new briefs, the en banc court heard oral argument on February 10, 2022. ECF No. 89.

Twelve days later, the Supreme Court granted a petition for a writ of certiorari in *Arellano v. McDonough*, 142 S. Ct. 1106 (2022), a case addressing whether equitable tolling applies to § 5110(b)(1)—which provides that, if VA receives a disability-benefits claim within one year of a veteran's discharge, the effective date for benefits is as early as the day following the day of the veteran's discharge. We immediately stayed proceedings in this case pending the Supreme Court's disposition of the *Arellano* case. ECF No. 91.

On January 23, 2023, the Supreme Court held that "§ 5110(b)(1) is not subject to equitable tolling." *Arellano*, 143 S. Ct. at 552. The Supreme Court explained that its decision in *Arellano* "resolve[s] only the applicability of equitable tolling to § 5110(b)(1). [It] do[es] not address the applicability of other equitable doctrines, such as waiver, forfeiture, and estoppel." *Id.* at 552 n.3. We lifted the stay and requested supplemental briefing on "the impact of the Supreme Court's decision in *Arellano* on this case." ECF No. 95, at 2. One concurrence, by Judge Dyk (joined by Judges Reyna and Wallach), suggested that the parties include in their supplemental briefs a discussion of whether equitable estoppel should be available based on 38 U.S.C.

§ 6303 (which originated in 1970 as § 241 and was codified for many years as § 7722). *Id.* at 3–9 (Dyk, J., concurring). A separate concurrence, by Chief Judge Moore (joined by Judge Prost), cast doubt on the suggestion. *Id.* at 10–12 (Moore, C.J., concurring).

Mr. Taylor and the government filed their supplemental briefs on March 15, 2023, and March 29, 2023, respectively. ECF Nos. 96, 101. We now decide the case.

II

The Supreme Court has described the features of the statutory regime that frame the questions before us. Through 38 U.S.C. § 1110 (wartime service) and § 1131 (peacetime service), "[t]he law entitles veterans who have served on active duty in the United States military to receive benefits for disabilities caused or aggravated by their military service." *George v. McDonough*, 142 S. Ct. 1953, 1957 (2022) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 400 (2009)). "A veteran seeking such benefits must first file a claim with . . . VA." *Id.* (citing 38 U.S.C. § 5101(a)(1)(A)). "A regional office of . . . VA then determines whether the veteran satisfies all legal prerequisites, including the requirement that military service caused or aggravated the disability." *Id.* (citing, among other authorities, 38 U.S.C. § 511(a)). "If the regional office grants the application, it assigns an 'effective date' to the award, and payments begin the month after that date." *Arellano*, 143 S. Ct. at 546 (citing 38 U.S.C. §§ 5110(a)(1), 5111(a)(1)).[2]

---

[2]    The 1970 counterparts of the cited provisions were materially the same for present purposes. *See* 38 U.S.C. §§ 310, 331 (1970) (counterparts of current §§ 1110, 1131); *id.* § 3001 (1970) (counterpart of current § 5101); *id.* § 211(a) (1970) (counterpart of current § 511(a)); *id.* § 3010 (1970) (counterpart of current § 5110).

Procedurally, as relevant here, after applying statutory standards, "the regional office issues an initial decision granting or denying benefits." *George*, 142 S. Ct. at 1957 (citing 38 U.S.C. §§ 511(a), 5104(a)). "A veteran dissatisfied with this decision may challenge it through several layers of direct review," starting with an appeal to "VA's Board of Veterans' Appeals" under 38 U.S.C. §§ 7104(a) and 7105(b)(1). *Id.* "If the Board also denies relief, the veteran may seek further review outside the agency"—first, in the Veterans Court, 38 U.S.C. §§ 7252(a), 7261(a), 7266(a), then in this court, 38 U.S.C. § 7292, and then in the Supreme Court, 28 U.S.C. § 1254(1). *See George*, 142 S. Ct. at 1957.[3]

The effective-date provision, § 5110, is the focus of the present case. "If the effective date precedes the date on which the VA received the claim, the veteran receives retroactive benefits," *Arellano*, 143 S. Ct. at 546, but such retroactive benefits are the exception and are limited.

> The default rule is that "the effective date of an award . . . shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor." This rule applies "[u]nless specifically provided otherwise in this chapter." Sixteen exceptions in § 5110 "provid[e] otherwise," including one specifying that "[t]he

---

[3]    The first-level and Board steps were materially similar to the current steps, for present purposes, as far back as 1970. *See* 38 U.S.C. §§ 210–212, 4001–4009 (1970). Judicial review outside VA was generally unavailable until 1988, when Congress created the Veterans Court to review VA decisions, with further review by this court. *See* 38 U.S.C. §§ 4051–4092 (1988) (establishing review of VA decisions regarding benefits by the Veterans Court and then by this court); *Bates v. Nicholson*, 398 F.3d 1355, 1362–64 (Fed. Cir. 2005) (recounting history).

> effective date of an award of disability compensa-
> tion to a veteran shall be the day following the date
> of the veteran's discharge or release if application
> therefor is received within one year from such date
> of discharge or release."

*Id.* at 546–47 (alterations in original) (quoting 38 U.S.C. § 5110(a)(1), (b)(1)). Several of the specific exceptions, the Court in *Arellano* explained, "reflect equitable considerations" that provide for specified, limited departures from the default rule for the specified circumstances. *Id.* at 549 & n.2.

The Court in *Arellano* explained the statute in the course of addressing the availability of equitable tolling. On that issue, the Court concluded: "Section 5110 contains detailed instructions for when a veteran's claim for benefits may enjoy an effective date earlier than the one provided by the default rule. It would be inconsistent with this comprehensive scheme for an adjudicator to extend effective dates still further through the doctrine of equitable tolling." *Id.* at 548. The Court noted that it was not "address[ing] the applicability of other equitable doctrines, such as waiver, forfeiture, and estoppel." *Id.* at 552 n.3.

Here, it is undisputed that, for Mr. Taylor, 38 U.S.C. § 5110 authorizes an effective date no earlier than February 28, 2007, the date that VA received Mr. Taylor's benefits claim. *See* Taylor Panel Opening Br. at 13 ("[Mr. Taylor] could not obtain an [effective date] prior to February 2007 for his award of benefits based on the provisions of 38 U.S.C. § 5110. This statute unequivocally precludes an effective date for an award of VA benefits prior to the date of [the] claim."); Sec'y En Banc Response Br. at 30. Mr. Taylor asserts two non-constitutional grounds for overriding § 5110's claim-filing effective-date limit: first, the general equitable doctrine of equitable estoppel, and second, a statute, 38 U.S.C. § 6303, that directs VA to provide certain outreach services to veterans—even before they file

claims with VA—concerning benefits for which they might be eligible.   He also asserts a constitutional ground, namely, that the claim-filing effective-date limits of § 5110 are unconstitutional as applied, because the government, for decades, denied him his constitutional right of access to the exclusive adjudicatory forum for vindicating his benefit entitlement.

These three contentions claim legal errors underlying the Veterans Court's rejection of his request for a pre-February 2007 effective date for benefits.  No objection has been raised to our jurisdiction under 38 U.S.C. § 7292 to consider any of the three grounds.  We view each ground as seeking a ruling on an issue of law that was either sufficiently raised to or decided (expressly or implicitly) by the Veterans Court.  *See Forshey v. Principi*, 284 F.3d 1335, 1338 (Fed. Cir. 2002) (en banc), *superseded in part by statute*, Veterans Benefits Act of 2002, Pub. L. No. 107-330, tit. IV, § 402(a), 116 Stat. 2820, 2832 (codified as amended at 38 U.S.C. § 7292), *as recognized in Morgan v. Principi*, 327 F.3d 1357, 1360–64 (Fed. Cir. 2003).  The availability of equitable estoppel was expressly rejected by the Veterans Court.  *Taylor CAVC 2019*, 31 Vet. App. at 154 n.4.  The constitutional-right-of-access argument was expressly made to the Veterans Court, *see* J.A. 109–13 (Taylor Veterans Court Br. at 14–18), which necessarily, albeit not explicitly, rejected it, *see Taylor CAVC 2019*, 31 Vet. App. at 151–52.  And we view the Veterans Court as having necessarily deemed § 6303 not to be a precondition to enforcing the claim-filing effective-date limits of § 5110, though without any § 6303-based argument from Mr. Taylor; the Veterans Court, in discussing equitable tolling, relied on our *Andrews* and *Rodriguez* precedents requiring that result. *Taylor CAVC 2019*, 31 Vet. App. at 154–55.

## III

Mr. Taylor first relies on equitable estoppel to try to overcome the § 5110 limit.  *See* Taylor En Banc Opening

Br. at 17, 20–49, 65.  Equitable estoppel—a doctrine "invoked to avoid injustice," *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59 (1984)—is rooted in "the maxim that no man may take advantage of his own wrong," *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232 (1959).  When equitable estoppel is applied against the government, "some form of affirmative misconduct must be shown in addition to the traditional requirements of estoppel."  *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000) (citing *Richmond*, 496 U.S. at 414, 421, 426; *Immigration & Naturalization Service v. Miranda*, 459 U.S. 14, 19 (1982); *Schweiker v. Hansen*, 450 U.S. 785, 788 (1981)); *see also Tefel v. Reno*, 180 F.3d 1286, 1303 (11th Cir. 1999) (collecting cases showing that every circuit has so held), *superseded in part by statute*, REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, *as recognized in Rendon v. U.S. Attorney General*, 972 F.3d 1252, 1256 & n.1 (11th Cir. 2020).

For purposes of this case, we may assume—without deciding—that the government action that caused Mr. Taylor not to file a claim for decades would meet the standards for equitable estoppel if that doctrine were available for the money claim at issue in this case.  *See, e.g.*, *R.H. Stearns Co. v. United States*, 291 U.S. 54, 61 (1934) ("He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned, for the law says to him, in effect: 'This is your own act, and therefore you are not damnified.'" (quoting *Dolan v. Rodgers*, 44 N.E. 167, 167 (N.Y. 1896); *Imperator Realty Co. v. Tull*, 127 N.E. 263, 266 (N.Y. 1920))).  We also need not decide the scope of equitable power possessed by the Veterans Court, beyond noting one limit.  Specifically, we may assume—again, without deciding—that the Veterans Court has all the equitable power that district courts have to apply equitable estoppel in the absence of a specific statutory provision conferring such power even when money is sought

from the public fisc.  No one offers any basis for supposing that the Veterans Court has more such power than that of Article III courts.  That limit is all that is needed to decide the equitable-estoppel issue here.

On these premises, we hold that the Supreme Court's decision in *Richmond*, 496 U.S. 414, establishes a limit on the availability of the doctrine of equitable estoppel that precludes that doctrine's application here.  *Richmond*'s limit on the doctrine's application governs regardless of whether the doctrine is invoked in a district court, in this court, or in a non-Article III forum such as the Veterans Court (or the Board).  It applies wherever (as here) there is no specific statutory provision turning the doctrine's principles into statutory standards so as to displace *Richmond*.  We reach this conclusion based on direct application of *Richmond*, coming to the same conclusion that we reached in *McCay*.[4]

The Supreme Court in *Richmond* confined the availability of the doctrine of equitable estoppel against the federal government based on the Appropriations Clause of the Constitution, which states, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  The Court held that "judicial use of the equitable doctrine of estoppel cannot grant . . . a money remedy that Congress has not authorized."  *Richmond*, 496 U.S. at 426 (citing *Immigration & Naturalization Service v. Pangilinan*, 486 U.S. 875, 883

---

[4]    We do not invoke the force of *McCay* as precedent regarding equitable estoppel.  To the extent that the Supreme Court's statement in *Arellano* that it was not addressing that doctrine, 143 S. Ct. at 552 n.3, invites us to consider the applicability of equitable estoppel without stare decisis reliance on our own earlier governing precedent, we have done so.  The Supreme Court did not invite us to depart from *Richmond*.

(1988)); *see also Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 198 n.9 (2012). The doctrine therefore cannot be invoked to grant Mr. Taylor the monetary award he seeks if the "applicable statutes" do not authorize the requested payment of money. *McCay*, 106 F.3d at 1581.

It is undisputed that Mr. Taylor qualifies for disability benefits under the applicable basic-entitlement statute, 38 U.S.C. § 1110, which provides for "compensation as provided in this subchapter" to any disabled veteran who was other than dishonorably discharged "[f]or disability resulting from personal injury suffered or disease contracted in [the] line of duty . . . in the active military . . . service, during a period of war." But Mr. Taylor's qualification for benefits under that provision does not end the inquiry. What is in dispute is how far back such benefits go, *i.e.*, the effective date of such benefits, and that inquiry is controlled not by § 1110 (or the subchapter of which it is a part) but by § 5110. Notably, the Supreme Court recently confirmed that the provisions of § 5110 "do not operate simply as time constraints, but also as substantive limitations on the amount of recovery due." *Arellano*, 143 S. Ct. at 549.

For essentially that reason, in *McCay*, we treated § 5110's effective-date provisions as substantive limitations on the amount of money that Congress has authorized to be paid, and we held that *Richmond* prevents tribunals from applying equitable estoppel to award "benefits retroactive to a date" earlier than that authorized by § 5110—*i.e.*, "money [that] VA is not authorized to pay." 106 F.3d at 1581–82. That result, we reaffirm, follows from *Richmond*. And it is further supported by the characterization of § 5110's limits in *Arellano*.

As we have noted, it is undisputed that § 5110 bars the pre-February 28, 2007 effective date that Mr. Taylor seeks, *see* Taylor Panel Opening Br. at 12–13; Sec'y En Banc Response Br. at 30, because VA received his benefits claim on February 28, 2007, more than one year after Mr. Taylor's

date of discharge, September 6, 1971, J.A. 28, 38. The § 5110(b)(1) exception is inapplicable. No other § 5110 exception is invoked. And § 5110(a)(1)'s general rule—that "the effective date of an award . . . of compensation . . . shall not be earlier than the date of receipt of application therefor"—therefore governs.

Mr. Taylor has not identified any provision (and we are aware of none) in which Congress has turned equitable-estoppel standards into statutory standards that could alter the results required by the § 5110 provisions for determining an effective date. No such authority appears in the statutory provisions governing the decision of the regional office (sometimes called the agency of original jurisdiction), *i.e.*, "the Secretary," *see, e.g.*, 38 U.S.C. § 511, §§ 5101–5109; the provisions governing decisions by the Board, *see, e.g., id.* §§ 7101–7113, especially § 7104; the provisions governing review in the Veterans Court, *see, e.g., id.* §§ 7251–7269, especially §§ 7252 and 7261; or the provisions governing this court's limited-scope review of the Veterans Court's decisions, *see id.* § 7292. *See generally Burris v. Wilkie*, 888 F.3d 1352, 1356–61 (Fed. Cir. 2018) (describing many of the statutes and explaining, in particular, the controlling force of statutory standards, not to be altered by equity, in the Veterans Court). Nothing in the statutes that govern here supplies an authorization greater than do the various statutory provisions applicable in the various cases in which the *Richmond* bar on the use of equitable estoppel was applied.[5]

---

[5]    *See, e.g., Richmond*, 496 U.S. 414 (proceeding in an appeal from Merit Systems Protection Board, involving 5 U.S.C. §§ 7701–7703); *Affordable Bio Feedstock, Inc. v. United States*, 42 F.4th 1288 (11th Cir. 2022) (tax-refund claim in district court, involving, *e.g.*, 26 U.S.C. § 7422 and 28 U.S.C. § 1346); *Kilgour v. Securities & Exchange*

Congress has separately granted the Secretary of Veterans Affairs certain equity-based authority:

> If the Secretary determines that benefits administered by the Department have not been provided by reason of administrative error on the part of the Federal Government or any of its employees, the Secretary may provide such relief on account of such error as the Secretary determines equitable, including the payment of moneys to any person whom the Secretary determines is equitably entitled to such moneys.

38 U.S.C. § 503(a); *see* 38 U.S.C. § 212(c)(2) (1970) (providing similar authority to the "Administrator," at the time the head of VA). That authority is "discretion[ary]." *Groves v. McDonough*, 34 F.4th 1074, 1077 n.2 (Fed. Cir. 2022). At oral argument before the en banc court, the government expressed doubt that Mr. Taylor's situation comes within the "administrative error" language of § 503(a), while noting that Mr. Taylor had not sought relief from the Secretary under that provision, En Banc Oral Arg. at 1:02:50–1:03:50, and Mr. Taylor immediately "agree[d]" that the provision does not apply to his situation, *id.* at 1:03:57–1:04:15. Regardless, no "equitable" language like the language in § 503(a) appears in the provisions

---

*Commission*, 942 F.3d 113 (2d Cir. 2019) (whistleblower claim, involving, *e.g.*, 5 U.S.C. § 706 and 15 U.S.C. § 78u-6(f)); *Deaf Smith County Grain Processors, Inc. v. Glickman*, 162 F.3d 1206 (D.C. Cir. 1998) (farm-subsidy and disaster-relief claims, involving, *e.g.*, 5 U.S.C. § 706 and 7 U.S.C. § 6999); *Perez v. United States*, 156 F.3d 1366 (Fed. Cir. 1998) (money claims in Court of Federal Claims, involving, *e.g.*, 10 U.S.C. § 634 and 28 U.S.C. § 1491); *Monongahela Valley Hospital, Inc. v. Sullivan*, 945 F.2d 576 (3d Cir. 1991) (Medicare reimbursement claim, involving, *e.g.*, 5 U.S.C. § 706 and 42 U.S.C. § 1395oo(f) (1988)).

governing the VA–Board process involved in this appeal. The contrast confirms that Congress has not made equitable-estoppel standards statutory in this context so as to make *Richmond* inapplicable. *See, e.g.*, *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).

We therefore hold that, under *Richmond*, equitable estoppel is not available to override the claim-filing effective-date limits of § 5110.

IV

In the supplemental brief he submitted after the Supreme Court decided *Arellano*, Mr. Taylor invoked what is now 38 U.S.C. § 6303 to support his request for an effective date earlier than the date allowed by § 5110. Taylor En Banc Supp. Br. at 4–7. Section 6303, entitled "outreach services," is part of a group of provisions for an "outreach services program," 38 U.S.C. §§ 6301–6308, constituting chapter 63 of Title 38. That group begins, in § 6301, with a general statement of purpose of the outreach services program "authorized" in what follows—to ensure that all veterans "are provided timely and appropriate assistance to aid and encourage them in applying for and obtaining" VA benefits and services and to "charg[e] [VA] with the affirmative duty of seeking out eligible veterans and eligible dependents and providing them with such services." *Id.* § 6301(a). Mr. Taylor refers to § 6301, but if, as we conclude, even the directive of § 6303 cannot help him here,

the mere statement of purpose cannot do so either, so we limit our discussion to § 6303.[6]

Section 6303(b) (originally § 241(1), later § 7722(b)) states that VA "shall by letter advise each veteran at the time of the veteran's discharge . . . from active military . . . service (or as soon as possible after such discharge . . . ) of all benefits and services under laws administered by [VA] for which the veteran may be eligible." 38 U.S.C. § 6303(b). Subsection (c) (originally § 241(2), later § 7722(c)) provides that VA "shall distribute full information to eligible veterans . . . regarding all benefits and services to which they may be entitled under laws administered by the Secretary." *Id.* § 6303(c)(1)(A). Subsection (d) (originally § 241(3), later § 7722(d)) states that VA "shall provide, to the maximum extent possible, aid and assistance (including personal interviews) to . . . veterans . . . with respect to subsections (b)

---

[6]    Congress enacted the outreach-services provisions in 1970 as 38 U.S.C. §§ 240–244. Veterans Education and Training Amendments Act of 1970, Pub. L. No. 91-219, § 214, 84 Stat. 76, 84–85 (enacting 38 U.S.C. §§ 240–244). In 1991, Congress recodified the group of provisions as 38 U.S.C. §§ 7721–7726. Department of Veterans Affairs Codification Act, Pub. L. No. 102-83, § 2(b), 105 Stat. 378, 400–02 (1991). In 2006, Congress again recodified the group of provisions, which are now 38 U.S.C. §§ 6301–6308. Veterans' Housing Opportunity and Benefits Improvement Act of 2006, Pub. L. No. 109-233, § 402, 120 Stat. 397–407. The provisions Mr. Taylor has cited are what are now § 6301 (originally § 240, later § 7721) and § 6303 (originally § 241, later § 7722). The parties have not suggested that any differences in wording over the decades make a difference to our consideration of these provisions, so for simplicity we use the current provisions for our discussion, sometimes with parenthetical notation of their predecessors.

and (c) and in the preparation and presentation of claims under laws administered by [VA]." *Id.* § 6303(d).

Mr. Taylor might be making either or both of two possible arguments about § 6303. One is that the provision justifies the application of equitable estoppel here even if compliance with § 6303 is not a statutory precondition to enforcing the claim-filing effective-date limits of § 5110. The other is that § 6303 compliance is such a precondition, so that the pair of statutes together mean that enforcing the § 5110 limits would be contrary to statute if there is noncompliance with § 6303 (making equitable estoppel and hence *Richmond* beside the point). We decline to adopt either proposition.

The first possible argument must be rejected for the simple reason that it is contrary to *Richmond*. If § 6303 is not a statutory precondition to enforcing the claim-filing effective-date limits of § 5110, then *Richmond* squarely applies. Using the doctrine of equitable estoppel to disregard the § 5110 limits would be awarding money contrary to statutory authorization.

We decline to accept the second possible argument but not because *Richmond* stands in the way. After all, where one statutory provision imposes a duty on an agency, and the agency's compliance with that statutory duty is properly understood to be a precondition to enforcing a benefit restriction stated in another statutory provision, *Richmond* does not prohibit awarding the benefit without regard to the benefit restriction if the precondition duty is not fulfilled. We have so held repeatedly. *See, e.g., Brush v. Office of Personnel Management*, 982 F.2d 1554, 1561–64 (Fed. Cir. 1992); *Johnston v. Office of Personnel Management*, 413 F.3d 1339, 1341–42 (Fed. Cir.), *modified*, 430 F.3d 1376 (Fed. Cir. 2005) (mem.) (per curiam); *Dachniwskyj v. Office of Personnel Management*, 713 F.3d 99, 102–03 (Fed. Cir. 2013). In such a situation, the two provisions together establish the statutory standard for a

benefit award; and when the precondition provision has been violated, it is enforcing (not failing to enforce) the restriction provision that would be contrary to statute, and the proper result is to provide the claimant what would have been paid had there been no precondition-provision violation. *See Pirkl v. Wilkie*, 906 F.3d 1371, 1378 (Fed. Cir. 2018) ("[T]he fundamental principle of corrective remedies that is used throughout the law, though sometimes with modifications" is that "[t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." (quoting *Wicker v. Hoppock*, 73 U.S. (6 Wall.) 94, 99 (1867), and citing, among other authorities, *Missouri v. Jenkins*, 515 U.S. 70, 87 (1995))). The basis for such an award is not the doctrine of equitable estoppel, which adds nothing to what is simply a statutory-violation and remedy analysis. It is that analysis, not equitable estoppel, on which *Brush* and similar cases rely. In such circumstances, *Richmond* is inapplicable because the doctrine of equitable estoppel (which is what *Richmond* limits) is not the basis of decision.

The problem with Mr. Taylor's second possible argument is instead with the merits of the contention that VA's compliance with § 6303 is a precondition to enforcing § 5110's claim-filing effective-date limits. In fact, we have twice held the opposite, *i.e.*, that VA's compliance with § 6303 is not a precondition to enforcing the "unequivocal command" of § 5110. *Rodriguez*, 189 F.3d at 1355. In *Rodriguez*, we held that § 6303(d) (at the time § 7722(d)) does not "create any enforceable rights" because the statute does not "prescribe[] any remedy for breach." *Id.* We concluded instead that § 6303(d) is "hortatory" rather than a provision imposing "enforceable legal obligations upon the Secretary" that condition enforcement of the § 5110 limits. *Id.* Later, in *Andrews*, 351 F.3d 1134, we applied *Rodriguez*'s reasoning to hold that § 6303(b) and (c) (at the time § 7722(b) and (c)) are likewise not preconditions to enforcing the § 5110 limits, stating: "VA's failure to notify under

§ [6303(b)] and (c)(1) may not serve as the basis for awarding an effective date in contravention of [§ 5110]." *Id.* at 1137.

The clarity of those binding precedents establishing that compliance with § 6303 is *not* a precondition to enforcement of the claim-filing effective-date limits of § 5110 is why we do not hold that Mr. Taylor forfeited his current argument for linking the two provisions by not presenting such an argument to the Veterans Court or to the panel, where the argument, which would require a sharp change in the law that bound the Veterans Court and the panel, would have been futile. *See, e.g.*, *In re Micron Technology, Inc.*, 875 F.3d 1091, 1097–98 (Fed. Cir. 2017) (citing authorities that recognize the futility of an argument requiring a departure from clear, binding precedent as a reason not to find forfeiture from the non-raising of an issue); *In re Montreal Maine & Atlantic Railway, Ltd.*, 953 F.3d 29, 38 n.2 (1st Cir. 2020). To conclude now that § 6303 compliance is a precondition to enforcement of the § 5110 limits at issue, we would have to overcome the force of stare decisis and overrule *Andrews* and *Rodriguez*. *See Robert Bosch, LLC v. Pylon Manufacturing Corp.*, 719 F.3d 1305, 1316–17 (Fed. Cir. 2013) (en banc) (recognizing the force of stare decisis when the en banc court considers adopting a position contrary to longstanding panel precedent). Statutory rulings carry particular stare decisis force because Congress can change them. *Id.* at 1317 (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008)); *see Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 456 (2015) (statutory precedents carry "enhanced force"); *see also Gamble v. United States*, 139 S. Ct. 1960, 1969 (2019) ("special justification" required to overrule even a constitutional precedent); *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984) (same).

Mr. Taylor conspicuously declines to even ask us to overrule *Andrews* or *Rodriguez*, and he makes no argument for doing so. He merely points out differences in facts

between his case and the facts of those cases, stating that this case involves more than "ordinary negligence" and that "[t]here is no dispute that the VA's ordinary negligence in failing to provide a form or reach an individual veteran with notice of the availability of benefits as provided in § 241 and its successor statutes [§ 7722, now § 6303] does not extend the effective date provision of 38 U.S.C. § 5110(b)(1)." Taylor En Banc Supp. Br. at 5. But stare decisis covers the clearly, twice-stated legal principle that was the rationale of the decisions—that § 6303 compliance is not a precondition to enforcing the § 5110 limits—not just the conclusion on the particular facts. *See, e.g., Bucklew v. Precythe*, 139 S. Ct. 1112, 1126 (2019); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996); *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1305 (Fed. Cir. 2020).

At least in the absence of a request to overrule *Andrews* and *Rodriguez*, let alone a developed argument for doing so, we decline to overrule them or, therefore, to disturb the conclusion on which they rely. There are in fact strong obstacles to any such overruling. And we have not been presented with any meaningful argument for overcoming them.

For one thing, the *Andrews* and *Rodriguez* precedents, which reject the link that Mr. Taylor's argument requires, are perfectly consistent with the text of the statutes. Neither § 5110 nor § 6303 refers to the other. And while § 6303 imposes certain notice and aid obligations, it says nothing about the distinct issue of relevance here—what consequence must follow failure to fulfill those obligations. In particular, it says nothing to the effect that any claim-filing effective-date limit of § 5110 becomes unenforceable as a result of such a failure. Nor has Mr. Taylor indicated why there is anything surprising about an "outreach services" obligation not being linked to the claim-deciding rules. Moreover, the absence of the link Mr. Taylor requires is bolstered by the placement of the provisions in

distinct chapters of Title 38: Section 5110 is part of chapter 51 ("Claims, Effective Dates, and Payments"), whereas § 6303 is part of chapter 63 ("Outreach Activities").[7]

The precedents are two decades old. *See Gamble*, 139 S. Ct. at 1969 (explaining that the strength of the argument for adhering to particular precedents "grows in proportion to their 'antiquity'" (quoting *Montejo v. Louisiana*, 556 U.S. 778, 792 (2009))). Congress has reenacted the provisions now codified at 38 U.S.C. § 6303 since then. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 680–81 (1981) (noting that Congress having "frequently amended the International Claims Settlement Act . . . demonstrat[ed] Congress'[s] continuing acceptance" of the "practice of claim settlement by executive agreement"). It reenacted the 1991-enacted § 7722 as § 6303 in 2006. *See supra* n.6 (detailing the history of § 6303). And in the past three years, Congress has reenacted § 6303 twice more. *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 926(a)(59), 134 Stat. 3388, 3830 (2021); Solid Start Act of 2022, Pub. L. No. 117-205, § 2(b)(2), 136 Stat. 2232, 2233. No reenactment, despite making some changes to the provisions, has disturbed this court's holding in *Andrews* and *Rodriguez* that enforcement of the claim-filing effective-date limits of § 5110 is not conditioned on fulfillment of the outreach

---

[7]    The chapter separation was a feature of the predecessor provisions as well. The 1970 provisions, §§ 240–244, were in chapter 3 ("Veterans' Administration; Officers and Employees"), while the predecessor of current § 5110, namely, § 3010, was in chapter 51 ("Applications, Effective Dates, and Payments"). *See* 38 U.S.C. Table of Contents (1976). The 1991 provisions, §§ 7721–7726, were in chapter 77 ("Veterans Benefits Administration"), while § 5110 was in chapter 51 ("Claims, Effective Dates, and Payments"). *See* 38 U.S.C. Table of Contents (1994).

duties of § 6303.  We give weight to this fact without the need to make it dispositive.

Recognizing such a link now, moreover, would raise a serious issue of possible inconsistency with the congressional judgment that has long limited to *claimants* (in contrast to the broad class of mere potential future claimants) the enforceable duty to assist stated in 38 U.S.C. § 5103A. That provision requires VA to, among other things, "make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim for a benefit under a law administered by the Secretary."  38 U.S.C. § 5103A(a)(1).  It traces back to the 1988 enactment of 38 U.S.C. § 3007(a) (1988) ("The Administrator shall assist such a claimant in developing the facts pertinent to the claim."), *see* Veterans' Judicial Review Act, Pub. L. No. 100-687, div. A, tit. I, § 103(a), 101 Stat. 4105, 4106–07 (1988), which "codif[ied]" an earlier regulatory duty, *Hayre v. West*, 188 F.3d 1327, 1331 (Fed. Cir. 1999), *overruled on other grounds by Cook v. Principi*, 318 F.3d 1334 (Fed. Cir. 2002) (en banc).  The "claimant" limitation has persisted through amendments and recodifications,[8] with Congress in 2022 providing an express definition for chapter 51: "The term 'claimant' means any individual applying for, or submitting a claim for, any benefit under the laws administered by the Secretary."  Sergeant First Class Heath Robison Honoring Our Promise to Address Comprehensive Topics Act of 2022,

---

[8]    *See* Veterans Claims Assistance Act of 2000, Pub. L. No. 106-475, § 3(a), 114 Stat. 2096, 2097–98; Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. No. 112-154, tit. V, § 505(a), 126 Stat. 1165, 1192–93; Veterans Appeals Improvement and Modernization Act of 2017, Pub. L. No. 115-55, § 2(c), (d), 131 Stat. 1105, 1105–06; William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 § 926(a)(51), 134 Stat. at 3830.

Pub. L. No. 117-168, tit. VIII, § 807(a)(1), 136 Stat. 1759, 1805 (codified at 38 U.S.C. § 5100(1)).

The enforceable assistance duty in chapter 51, which does not attach until claiming, fits closely with the claim-filing effective-date limits of § 5110. Making those limits unenforceable for noncompliance with § 6303, which applies to notice and aid to veterans for what may be many years before claiming, would have a large potential disruptive effect on the claim-filing effective-date limits of benefit awards. Such "practical consequences" seem out of keeping with the longstanding, repeated congressional actions just described. *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 163 (2008); *see Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes.").

Mr. Taylor proposes that a link between § 6303 and § 5110 can be limited to the type of affirmative secrecy-oath action that deters claim filing that is at issue here. Taylor En Banc Supp. Br. at 5–6. But there is no language in § 6303 that would support such a limit. The duties imposed are not in any way confined to avoidance of such action; they are duties of affirmative notice and aid. Moreover, the contours of those duties are uncertain, not having been part of benefits litigation for at least two decades (perhaps back to the enactment of the outreach duties), and there is a high potential for injecting new issues without straightforward answers into benefits litigation if the effective date of benefits were now to depend on fulfillment of those duties. The potential consequences of adopting Mr. Taylor's § 6303 argument thus appear to be considerably greater than the consequences of reaching the narrow conclusion on the constitutional right of access discussed (and adopted) next, which is confined to the affirmative secrecy-oath action, with adjudication-foreclosing and claim-deterring effects, involved in this matter.

In short, "the practical problems" identified here "are too serious, too extensive, and too likely to come about for us to dismiss them as insignificant." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 545 (2013). For that reason and the others that we have set forth, we are not prepared to overrule *Andrews* or *Rodriguez*. We therefore decline to disturb our precedent under which VA's compliance with § 6303 is not a precondition to enforcing § 5110's claim-filing effective-date limits.

V

We next consider Mr. Taylor's constitutional argument that the government violated his fundamental right of access to the exclusive adjudicatory forum for vindication of his legal entitlement to VA disability benefits. *See* Taylor En Banc Opening Br. at 18–19, 49–65. The government makes no suggestion that Mr. Taylor forfeited this argument in this litigation or that he waived the constitutional right by taking the secrecy oath. We hold that Mr. Taylor succeeds on this ground.

A

1

"The Supreme Court has long recognized that citizens have a right of access to the courts." *Broudy v. Mather*, 460 F.3d 106, 117 (D.C. Cir. 2006). Having explained early on that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803), the Supreme Court elaborated in 1907:

> The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by [the government] . . . .

*Chambers v. Baltimore & Ohio Railroad Co.*, 207 U.S. 142, 148 (1907).  The Supreme Court has reaffirmed the right of access several times, *see*, *e.g.*, *Lewis v. Casey*, 518 U.S. 343, 350 (1996) ("The right that [we] acknowledged was the (already well-established) right of access to the courts." (emphasis omitted)); *Bounds v. Smith*, 430 U.S. 817, 824 (1977) ("[O]ur decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts."), and it has explained that the right embraces access to executive agencies in suitable circumstances as well as to the courts, *see Borough of Duryea v. Guarnieri*, 564 U.S. 379, 394 (2011) (explaining that the First Amendment's "Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes"); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) (applying the right of access to an executive agency).

In *Christopher v. Harbury*, the Court observed that it has "grounded the right of access" in various constitutional provisions—"the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses." 536 U.S. at 415 n.12 (citations omitted) (collecting cases). Those multiple roots reflect the *Chambers*-recognized foundational character of the right in our legal system.  *See*, *e.g.*, 1 William Blackstone, Commentaries, *141 (noting that the common law of England granted the right "of applying to the courts of justice for redress of injuries").  For such reasons, the Supreme Court has characterized the right of access as a "fundamental right." *Tennessee v. Lane*, 541 U.S. 509, 533 (2004); *see id.* at 533–34 (recognizing congressional power under Section 5 of the Fourteenth Amendment to enforce "the fundamental right of access to the courts"); *Lewis*, 518 U.S. at 346 (discussing what "the fundamental constitutional right of access to the courts

requires" (quoting *Bounds*, 430 U.S. at 828)); *see also, e.g.,* *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057, 1061 (9th Cir. 2014) ("The right of access to the courts is a fundamental right protected by the Constitution." (cleaned up)); *Swekel v. City of River Rouge*, 119 F.3d 1259, 1261 (6th Cir. 1997) ("It is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution." (cleaned up)).

The Court in *Christopher* noted that a claim of denial of the access right necessarily refers to an underlying entitlement and opportunity to litigate that entitlement and can take either of two perspectives regarding that opportunity. It can be forward-looking, in the sense that it complains of current frustration of still-available access to a forum for vindicating an underlying entitlement and seeks that access now; or it can be backward-looking, in the sense that it complains of past frustration of such access where that access is no longer available. 536 U.S. at 413–14. In both categories, "the ultimate justification . . . is the same": "Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414–15. The right of access is thus "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* at 415. And "when the access claim . . . looks backward," the one asserting a right-of-access violation "must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Id.*

2

The government here accepts that there is a constitutional right of access to adjudicatory forums and that it applies to access to the VA benefits adjudicatory system. Sec'y En Banc Response Br. at 47 ("[A] veteran such as Mr.

Taylor could assert a constitutional right of access to the VA benefits system . . . ."); *id.* at 42–47. The government does not suggest that a different standard applies because the initial adjudicator is an agency, rather than an Article III court, in this matter. Nor does the government dispute that the requirement at the heart of the Supreme Court's decision in *Christopher*—the existence of an underlying legal entitlement to which a right of access applies, 536 U.S. at 413–18—is clearly met here. Mr. Taylor has a legal entitlement: "The law entitles veterans who have served on active duty in the United States military to receive benefits for disabilities caused or aggravated by their military service." *George*, 142 S. Ct. at 1957 (quoting *Sanders*, 556 U.S. at 400). Under 38 U.S.C. § 5110, that entitlement includes the entitlement to benefits for particular periods but only if it is claimed on time. The government has cited no congressional elimination or modification of the explicit legal entitlement, so this case involves executive action asserted to deprive a claimant of access to an adjudicatory forum to vindicate a statutory entitlement.

The government also accepts that the VA adjudicatory process involved in this case is the exclusive means of vindicating that entitlement—assertedly more than three decades' worth of compensation for service-connected disabilities—as a nondiscretionary matter.[9] It points to no other possible route to securing the compensation to which the statute grants an entitlement. The government further accepts that the penalty-backed secrecy oath, with no exception for VA adjudicatory processes, in fact caused Mr. Taylor to refrain from filing a claim before 2007, stating:

---

9    As noted above, 38 U.S.C. § 503(a) grants the Secretary certain authority to award benefits, but that authority is discretionary, and the government has indicated—and Mr. Taylor has asserted—that the provision is inapplicable here. *See supra* pp. 23–24.

"[T]he consequence of the oath was that Mr. Taylor refrained from seeking benefits until 2007." Sec'y En Banc Response Br. at 28; *see id.* at 26, 33. Accordingly, this case involves "official acts" that "caused . . . the loss of an opportunity to seek some particular order or relief"—which is the definition of the category of backward-looking right-of-access claims recognized in *Christopher*, 536 U.S. at 414.

The government accepts as proper the formulation for assessing right-of-access claims of this type—given an undisputed underlying legal entitlement—stated by the Ninth Circuit in *Silva v. Di Vittorio*, which speaks of "active interference" that is "undue." 658 F.3d 1090, 1103 (9th Cir. 2011); *see* Sec'y En Banc Response Br. at 46 ("[T]he 'active interference' that is labeled 'undue' test from *Silva* is consistent with *Christopher v. Harbury* and is an appropriate alternative test for right of access to the court claims."); *id.* at 9. As applied to an exclusive adjudicatory forum, this approach asks whether the government has, by affirmative conduct, unduly interfered with the individual's access to the adjudication offered by the forum. *See also Snyder v. Nolen*, 380 F.3d 279 (7th Cir. 2004) (per curiam) (applying a similar test). The government notes that, in *Christopher*, "[t]he Supreme Court did not explicitly adopt or establish a test for the denial of a right of access," Sec'y En Banc Response Br. at 45, and the government does not elsewhere identify a general test specifying further details of the constitutional standard, including what levels of interference suffice and how the government might justify actions that do interfere with access. We follow the *Silva* formulation, applied in light of the fundamental character of the right at issue.

B

In this case, as noted, the government took the affirmative act of securing a secrecy oath backed by court-martial and prosecution threats, with no exception for VA adjudicatory processes. That act, which would naturally be

understood as foreclosing the ability to support an essential element of the standard for benefits, actually caused Mr. Taylor to refrain from filing the claim at issue to vindicate his legal entitlement for a period of up to three and a half decades—until the government generally lifted the secrecy restriction. Under § 5110, the absence of an earlier claim foreclosed pre-filing benefits to which Mr. Taylor was entitled. And there is an evident "remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought," *Christopher*, 536 U.S. at 415—namely, determining the effective date for benefits by disregarding the statutory limits that are unconstitutional as applied.

The government makes essentially three arguments for nevertheless rejecting Mr. Taylor's request for relief on this constitutional ground. First, it contends that the interference was not severe enough. Sec'y En Banc Response Br. at 47–52. Second, it contends that the governmental interest in secrecy made the interference justified (and hence not "undue"). *Id.* at 52–54. Third, it contends that, even if there was sufficiently active and undue interference, "Mr. Taylor cannot identify an available remedy." *Id.* at 42, 54–56. We reject these arguments.

1

The secrecy oath, backed by the possibility of court-martial or prosecution, was ample affirmative interference with the right of access at issue—access to meaningful adjudicatory processes in the exclusive forum in which Mr. Taylor could have vindicated the entitlement at issue. The oath undisputedly did cause Mr. Taylor not to file a claim. This was its natural, predictable effect. The oath did not state an exception for VA processes, and both Mr. Taylor and the government must have known that the standard for vindicating the entitlement—establishment of service connection of the disability, 38 U.S.C. § 310 (1970) (now § 1110)—could not be met without information about the

Edgewood program that was squarely within the secrecy oath. And the government has not identified any communication from the Executive that would have informed Mr. Taylor that VA on its own would secure all information needed for the adjudication of this essential element. At least in the absence of such a communication making clear how Mr. Taylor could file a claim and obtain a meaningful adjudication, the penalty-backed oath readily counts as a barrier to access of the VA adjudicatory system for vindication of the benefit entitlement.

The government itself states: "[T]he Secretary does not mean to suggest that a veteran should have to risk prosecution in order to apply for benefits." Sec'y En Banc Response Br. at 51. The Supreme Court has elsewhere recognized the common-sense point that a threat of prosecution can operate as an effective barrier to court access. *See, e.g.*, *Ex parte Young*, 209 U.S. 123, 148 (1908) ("[T]o impose upon a party interested the burden of obtaining a judicial decision of such a question (no prior hearing having ever been given) only upon the condition that, if unsuccessful, he must suffer imprisonment and pay fines, as provided in these acts, is, in effect, to close up all approaches to the courts . . . ."); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat . . . ."). The government points to no authority to support a conclusion that a threat of court-martial or prosecution covering disclosure of claimant-possessed reliable information relevant and necessary to a desired adjudication, with no known avenue for proceeding without such disclosure, is insufficient to constitute active interference for purposes of the constitutional

right of access. Mr. Taylor, we conclude, was "shut out of court" and "completely foreclosed" from obtaining an adjudication, so that his filing a claim would have been "futile"—to use the language the government quotes from the Supreme Court's *Christopher v. Harbury* decision, 536 U.S. at 415, and the D.C. Circuit's opinion in *Harbury v. Deutch*, 244 F.3d 956, 957 (D.C. Cir. 2001). Sec'y En Banc Response Br. at 43, 45, 47–48. We do not address any other circumstance.[10]

The government asserts that two or three veterans cited the Edgewood program in seeking benefits before the partial declassification in 2006. *See* Sec'y En Banc Response Br. at 49–50.[11] The existence of a few such risk-

---

[10]   Neither the Supreme Court nor the D.C. Circuit used that language to declare a minimum requirement; both were simply discussing the plaintiff's own characterization of her situation—which the D.C. Circuit held the plaintiff should have an opportunity to prove, and which the Supreme Court assumed in the course of reversing on other grounds (the absence of a threshold identification and determination of the underlying entitlement and cause of action for redress lost by virtue of the challenged government action). In fact, the Supreme Court elsewhere used the language of "frustrating" access. *Christopher*, 536 U.S. at 413. We have no occasion to address any facts showing an impairment of access to an adjudication less severe than present in this case.

[11]   The government cites *Hospedale v. Shulkin*, No. 16-3360, 2018 WL 794875 (Vet. App. Feb. 9, 2018), *Forrest v. McDonald*, No. 14-1572, 2015 WL 3453892 (Vet. App. June 1, 2015), and *DiAngelis v. McDonough*, No. 19-8769, 2021 WL 1901184 (Vet. App. May 12, 2021). In *Forrest*, it appears that the veteran first filed an Edgewood-related claim for benefits after 2006, though he sought treatment from the VA earlier. *Forrest*, 2015 WL 3453892, at *2.

takers does not undermine the general conclusion. That is especially so because of how little the government has shown about the three veterans' cases it cites. We have not been told whether any of those veterans were prosecuted and if not, why not; *e.g.*, perhaps the information disclosed was too slight or there were case-specific reasons underlying prosecutorial exercise of discretion. The government also does not assert, and the opinions do not suggest, that any of those veterans (or others, for that matter) actually succeeded before 2006 on an Edgewood claim, which may mean that even these veterans did not feel free to disclose information needed to prove service connection. Thus, these few matters do not even show the non-futility of seeking Edgewood-based benefits before 2006. Regardless, they do not support treating the penalty-backed oath as less than an interference with access to the needed adjudicatory process for constitutional purposes.

Relatedly, the government asserts that the oath "does not contain an explicit prohibition on discussing the Edgewood [p]rogram with [f]ederal agencies such as . . . VA." *Id.* at 49. But as noted above, the government acknowledges that the oath did actually cause Mr. Taylor not to file an Edgewood-based benefits claim before 2007, *see id.* at 26, 28, and no "explicit" reference to VA, by name, was needed for the oath to be reasonably and predictably read by veterans as reaching VA. Nothing in the oath informed its signers that VA was something other than an "organization . . . or other group or entity[] not officially authorized to receive such information." S. Rep. No. 94-755, Book I, at 418. It seems to us an unsound application of the right of access to hold that a former servicemember loses the right by "interpret[ing] the oath in the way most beneficial to the government" rather than testing its limits without authorization—a choice one might expect and even commend. Taylor En Banc Reply Br. at 26; *see* En Banc Oral Arg. at 42:40–43:15 (The court: "Are you saying that the government has a compelling interest in having their

soldiers interpret their secrecy oaths narrowly? . . . I think you would want . . . those secrecy oaths to be interpreted as broadly as possible." The government: "The Secretary recognizes that there are holes in our oath interpretation argument.").

The reasonableness of Mr. Taylor's view of the oath is confirmed by the 2006 letter that VA sent to him and other Edgewood veterans. The letter stated that the Department of Defense had granted limited permission for Edgewood veterans "to disclose to health care providers information about their involvement in the Edgewood Program that affected their health," *Taylor CAVC 2019*, 31 Vet. App. at 149 (citing Vet. Ct. Rec. at 2695–97), but warned "not [to] discuss anything that relates to operational information that might reveal chemical or biological warfare vulnerabilities or capabilities," J.A. 32. This letter indicates that Edgewood veterans were not authorized to provide details about Edgewood to VA (which provides health care to many veterans) before the 2006 partial declassification—and that the government considered the oath to be enforceable after discharge.

The government further argues that it did not "entirely," Sec'y En Banc Response Br. at 9, and "completely foreclose[]" Mr. Taylor from accessing VA because, the government maintains, he could have filed a "minimal claim before 2006 without divulging classified information," *id.* at 48. The government acknowledges, however, that such "a minimal claim likely would have been insufficient for Mr. Taylor to obtain service connection." *Id.* The government's suggestion about the role of a minimal claim is, rather, that if the claim had been filed and denied for want of crucial information, it would have served as a placeholder for the time when, decades later in 2006, secrecy was lifted and the Secretary adopted a regulation that permitted reopening, with retroactive effect as far back as the date of the original filing, if the new and material evidence justifying reopening consists of "[d]eclassified records that

could not have been obtained because the records were classified when VA decided the [original] claim." 38 C.F.R. § 3.156(c)(1)(iii); *see also id.* § 3.156(c)(3); New and Material Evidence, 71 Fed. Reg. 52,455, 52,457 (Sept. 6, 2006).[12]

We reject this argument. The government does not even now explain what a "minimal" claim would have looked like such that it would have truly eliminated the risk of penalties for disclosures, and it certainly points to no communication from the government that would have so informed Mr. Taylor before 2006. More fundamentally, the government's placeholder scenario is not enough to mean that the constitutionally required "meaningful access," the "touchstone" of the constitutional right at issue, *Lewis*, 518 U.S. at 351 (quoting *Bounds*, 430 U.S. at 823), was actually present all along. Meaningful access is not merely an empty opportunity to submit a piece of paper that the government forbids to be filled out or later supported as needed to vindicate the entitlement, thereby rendering a filing futile. To say otherwise is to ignore the purpose of the constitutionally guaranteed access—to obtain an adjudication. Of course, under the *Silva* right-of-access formulation, under which government interference might not be "undue" because it was justified, a government action that precludes an adjudication might not in the end be unconstitutional. But that conclusion would be

---

[12] Although the government suggested at oral argument that VA's amendment of § 3.156 in 2006 was simply a codification of prior practice, En Banc Oral Arg. at 43:38–44:49; *cf.* 71 Fed. Reg. at 52,456 ("[T]he purpose of this rule is to clarify longstanding VA rules . . . ."), the government submitted a post-argument letter stating that "VA has undertaken [a] search and has been unable to locate any manual or other publication that addresses" a "pre-existing policy that was clarified in 38 C.F.R. § 3.156(c) (2006)." ECF No. 90, at 1.

based on the adequacy of the justification, not on any sound conclusion that meaningful access had actually been available. (The justification issue is discussed in the next section, V.B.2, of this opinion.)

In any event, even if it could be said that meaningful access is present in some situations where the government tells prospective claimants that they can file claims that will assuredly be denied for now because support is barred, such a conclusion could not be justified here. The government relies on what was a mere possibility of future changes to reopening rules and government secrecy policy, not imminent or on the horizon or communicated to Mr. Taylor and other Edgewood veterans. At least some Edgewood veterans presumably did not live long enough to see those possibilities mature into actual changes, after decades. Those veterans, as well as those who did survive, were denied the sole forum to vindicate their entitlements to compensation meant to support veterans in living their lives, limited by disability incurred in service of the Nation. During all the intervening years, those veterans were denied meaningful access, and that denial existed independently of the fact that secrecy was ultimately lifted.

Finally, the government contends that it cannot have actively interfered with Mr. Taylor's efforts to pursue his legal claim because the "oath was not designed"—and the government did not "intend[]"—to target Mr. Taylor's or any Edgewood veteran's access to VA. Sec'y En Banc Response Br. at 52, 54. The right-of-access case law does not support this purported scienter requirement, at least if the government means it to go beyond what is indisputably present here. *See, e.g.*, *Lewis*, 518 U.S. at 350–51; *Silva*, 658 F.3d at 1101–04; *Snyder*, 380 F.3d at 289–91. It was entirely foreseeable that a servicemember participating in the Edgewood program would suffer injury that would be disabling after discharge. The availability of and requirements for post-service disability compensation are pervasively known to those in the service, and those who

organized the Edgewood program can be attributed knowledge of the consequence of the oath for access to such compensation.

We therefore conclude that the government actively interfered with Mr. Taylor's access to the exclusive adjudicatory forum for vindication of his legal entitlement to disability benefits.

2

We also reject the government's contention that it has justified the interference with Mr. Taylor's access to the VA adjudicatory forum. That contention rests on the public interest in secrecy tied to military matters. We do not question the strength of that interest. *See also* Taylor En Banc Opening Br. at 59 ("No one disputes that the government has an interest in maintaining the confidentiality of certain government programs."). But we conclude that the government has not shown that its interference with Mr. Taylor's right of access was adequately tailored to serve that interest.

Neither party points to a right-of-access Supreme Court precedent that specifically states a standard for assessing an asserted justification. But two sources point to a sensible standard here—a requirement of narrow tailoring to the secrecy interest invoked (which we accept as compelling), which demands a showing that less adjudication-foreclosing alternatives could not have protected the interest.

First: A fundamental constitutional right (such as the right of access) is often governed by strict scrutiny, which requires, for justification, that the government conduct be narrowly tailored to serve a compelling state interest. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 301–02 (1993) (explaining that due process "forbids the government to infringe certain 'fundamental' liberty interests at all . . . unless the infringement is narrowly tailored to serve a compelling state

interest" (emphasis omitted)); *id.* at 305 ("[N]arrow tailoring is required only when fundamental rights are involved."); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (similar in First Amendment religion context); *Ryland v. Shapiro*, 708 F.2d 967, 972 (5th Cir. 1983) (applying strict scrutiny to a constitutional right-of-access claim); *cf. Lane*, 541 U.S. at 529 (explaining that the situation before the Court involved "basic rights, including the right of access to the courts . . . , that call for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications").[13]

A narrow-tailoring standard commonly requires the government to address concretely the possibility of less right-denying measures because, "so long as the government can achieve its interests in a manner that does not burden [the fundamental right at issue], it must do so." *Fulton*, 141 S. Ct. at 1881; *see Grutter v. Bollinger*, 539 U.S. 306, 336, 339 (2003) (holding, in the context of an equal-protection challenge to a "race-conscious admissions program," narrow tailoring, while not requiring "exhaustion of every conceivable race-neutral alternative," "does, however, require serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks"); *Fisher v. University of Texas at Austin*, 570 U.S. 297, 312 (2013) (similar); *McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (explaining in a First Amendment case: "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."); *Americans for Prosperity Foundation v.*

---

[13]   Mr. Taylor invoked strict scrutiny in his opening en banc brief.  Taylor En Banc Opening Br. at 58–61.  The government, in its response brief, did not disagree.

*Bonta*, 141 S. Ct. 2373, 2385, 2386 (2021) (similar, in right-of-association case).

Second: The Supreme Court has made a comparable point in the closely analogous context of deciding whether government military-secrecy interests preclude the maintenance or continuation of litigation. Specifically, in *General Dynamics Corp. v. United States*, the Court concluded that the government's military-secrecy interests should not bar a proceeding to vindicate a legal entitlement except as a "last resort" and only "when full litigation . . . 'would inevitably lead to the disclosure of' [the] secrets." 563 U.S. 478, 486, 492 (2011) (citing *Totten v. United States*, 92 U.S. 105, 107 (1876)). At least as far as the present case is concerned, this standard aligns with all that we need to borrow from the just-described narrow-tailoring requirement to decide this case, which is a demand not for perfect tailoring but for a concrete government explanation of the inability to protect the secrecy interest, while affording access, by measures the government itself has used in a closely related context.

The government has not met that standard. It presents generalizations about military secrecy, an interest whose strength we do not question, but it has not given concrete reasons that this interest could not have been protected while giving Edgewood veterans an adjudication. For example, it has not addressed the possibility of a special office within VA (perhaps with a special role played by Department of Defense personnel) that could have carried out the Secretary's first-level adjudication—where the great bulk of veterans' benefits claims are resolved—with information on a benefits claim form notifying a claimant of when and how to invoke the special process. For the subset of claimants for whom appeal to the Board was relevant, the government has not addressed the possibility of having channeled Board review of secrecy-constrained

matters to a specially designated panel of the Board.[14] Further review was generally not available beyond the Board until 1988, *see supra* n.3, but even considering today's review regime, the government has not addressed the ability of the reviewing tribunals outside VA, starting with the Veterans Court, to employ secrecy-protection measures that are commonly used in courts. Nor, finally, has the government addressed the possibility that some portions of the multi-level review system might be made available even if others cannot be.

These possibilities are anything but theoretical. As the government here acknowledges, VA has in fact established just such a special mechanism for processing claims from veterans who served in the special forces—*i.e.*, a system for processing claims based on injuries from service activities whose very existence must remain secret. *See* Sec'y En Banc Response Br. at 52–53 (citing U.S. Department of Veterans Affairs, *Adjudication Procedures Manual*, M21-1, Part VIII, Subpart iv, Chapter 9, Section A—Claims Based on Participation in Special Operations Incidents (last updated Dec. 27, 2021)). The government called attention to this process during its oral argument to the Supreme Court in *Arellano*. It explained that the special process—"for at least the cases of special operations"—begins with VA submitting "what's called a classified research request to the . . . central military records organization, which will then

---

[14]    Today, the statute provides that members may be appointed by the Secretary, with presidential approval, on recommendation of the Board Chairman. 38 U.S.C. §§ 7101A (appointments), 7102(a) (assignment of matters). In 1970, the statute was similar: Members were appointed by the Administrator with presidential approval. 38 U.S.C. § 4001(b) (1970); *see also* Exec. Order No. 6230, *reprinted in* 38 U.S.C. § 723, at 1696–68 (1934) (establishing the Board).

run that research request and then send back to the regional office, okay, there is credible evidence supporting the claim or not." Transcript of Oral Argument at 28–29, *Arellano*, 143 S. Ct. 543 (No. 21-432).

The government has not adequately justified a conclusion that it could not have established a similar procedure for Edgewood veterans. And when the government suggests that Mr. Taylor's oath might not have actually barred claim-supporting communication with VA, *see*, *e.g.*, Sec'y En Banc Response Br. at 49, it gives some support to the idea that the government's interest in maintaining the secrecy of Edgewood might well have been accommodated by such a procedure. In these circumstances, we conclude that the government has provided no meaningful showing that the oath was adequately tailored to achieve the government's military-secrecy interest, and so the interference with Mr. Taylor's right of access to VA for adjudication to vindicate his legal entitlement was undue.[15]

---

[15] The government quotes Justice Thomas's statement in concurrence in *Christopher v. Harbury* that he found "no basis in the Constitution for a 'right of access to courts' that effectively imposes an affirmative duty on [g]overnment officials either to disclose matters concerning national security or to provide information in response to informal requests." Sec'y En Banc Response Br. at 59 (quoting 536 U.S. at 422 (Thomas, J., concurring in the judgment)). Here, however, we conclude that the government has not shown that the right of access to the sole adjudicatory system for vindicating the entitlement at issue would actually require disclosure of matters concerning national security (or providing information in response to informal requests).

3

The government is mistaken in its final argument as well.  The foregoing analysis means that it would be unconstitutional to apply § 5110's claim-filing effective-date limits to deny otherwise-awardable benefits for the period during which the government unconstitutionally denied Mr. Taylor access to the VA adjudicatory forum.  Contrary to the government's suggestion, the denial of his constitutional right of access for up to three and a half decades *is* remediable: Mr. Taylor has "identif[ied] a remedy that may be awarded as recompense here and not otherwise available in some suit that may yet be brought." *Christopher*, 536 U.S. at 415.  This court and the Veterans Court are statutorily authorized, if the claim-filing effective-date limits of § 5110 are unconstitutional as applied here, to require determination of the effective date without regard to those limits.  The normal remedial principle would give Mr. Taylor the effective date he would have had if no unconstitutional denial of access had occurred.

a

Two well-established principles apply here.  First, "[i]f an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 700 n.5 (8th Cir. 2021); *see Fisher v. King*, 232 F.3d 391, 395 n.4 (4th Cir. 2000) (same) (citing *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 758–59 (1988)); *see also Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'" (quoting *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921))); *Troxel v. Granville*, 530 U.S. 57, 73 (2000) (holding statute unconstitutional as applied); *Palmer v. City of Euclid*, 402 U.S. 544, 545 (1971) (same); *U.S. Shoe Corp. v. United States*, 114 F.3d 1564, 1577 (Fed. Cir. 1997) (holding statute

unconstitutional under the Export Clause "to the extent it applies to exports"); *International Business Machines Corp. v. United States*, 59 F.3d 1234, 1239 (Fed. Cir. 1995) (holding statute unconstitutional as applied).  Second, "[t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Wicker*, 73 U.S. at 99; *see also United States v. Virginia*, 518 U.S. 515, 547 (1996) ("A remedial decree . . . must be shaped to place persons unconstitutionally denied [a right] in 'the position they would have occupied in the absence of [that constitutional violation].'" (quoting *Milliken v. Bradley*, 433 U.S. 267, 280 (1977))); *Jenkins*, 515 U.S. at 87 (noting that "all remedies" are designed "to restore the victims of [wrongful] conduct to the position they would have occupied in the absence of such conduct" (quoting *Milliken v. Bradley*, 418 U.S. 717, 746 (1974))); *see Pirkl*, 906 F.3d at 1378.

Those principles require that Mr. Taylor be given the effective date for his benefits, without regard to the claim-filing effective-date limits of § 5110, that he would have had in the absence of the government's unconstitutional interference with his access to the VA adjudicatory system. This means that Mr. Taylor's effective date should be the date that he met the substantive requirements for benefits, back as far as the date that he would have filed a claim for such benefits in the absence of the unconstitutional interference (plus any further back-dating allowed by § 5110). This effective date might be as far back as September 7, 1971, the day after his discharge, under 38 U.S.C. § 5110(b)(1).  And different periods prior to 2007 might call for different ratings if Mr. Taylor's disability changed during that period in such a way that different ratings would have been applied over time had the government not

unconstitutionally interfered with his access to the adjudicatory system.[16]

b

Both this court and the Veterans Court have statutory authority to order such a remedy. It is "the very essence of judicial duty" that, "if both [a] law and the [C]onstitution apply to a particular case," the court decides the case "conformably to the [C]onstitution, disregarding the law." *Marbury*, 5 U.S. (1 Cranch) at 178. "This approach derives from the Judiciary's 'negative power to disregard an unconstitutional enactment' in resolving a legal dispute." *United States v. Arthrex*, 141 S. Ct. 1970, 1986 (2021) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)).

This court is authorized "to review and decide any challenge to the validity of any statute," 38 U.S.C. § 7292(c), and to "decide all relevant questions of law, including interpreting constitutional and statutory provisions," *id.* § 7292(d)(1); *see also id.* § 7292(d)(2) (providing that "*[e]xcept to the extent that an appeal under this chapter presents a constitutional issue*," this court "may not review . . . a challenge to a law or regulation as applied to the facts of a particular case" (emphasis added)). Those provisions, as the government agrees, empower "this court [to] find something unconstitutional as applied." En Banc Oral Arg. at 55:05–:15. And this court is empowered, if a Veterans Court decision "is not in accordance with law, to modify or reverse the decision of the [Veterans Court] or to remand the matter, as appropriate." § 7292(e)(1). That power must include the power to state the remedial principles needed to give effect to an unconstitutionality ruling and the power

---

[16]    The government has not argued, based on laches or otherwise, that Mr. Taylor delayed unduly in filing for benefits after getting a green light in 2006. He filed for benefits promptly, on February 22, 2007.

to require the Veterans Court to apply those principles, with any necessary aid from the Board.

The Veterans Court, for its part, has been granted the power, among others, to "hold unlawful and set aside decisions, findings . . . , conclusions, rules, and regulations issued or adopted by the Secretary [or by] the Board . . . found to be . . . contrary to constitutional right." 38 U.S.C. § 7261(a)(3)(B). This power readily encompasses the authority to adjudge that the statute applied by the Secretary or Board, in this case § 5110, is unconstitutional as applied. *See Oklahoma v. U.S. Civil Service Commission*, 330 U.S. 127, 138 n.13 (1947) (stating that the Administrative Procedure Act's (APA's) judicial review provision codified at 5 U.S.C. § 706—which contains the identical phrase "contrary to constitutional right" found in § 7261—includes "issues of the constitutionality of [the] enactments and action thereunder"). And as the government recently explained to the Supreme Court in discussing the materially identical provisions of the APA, *see* 5 U.S.C. § 706(2)(B), "set aside," in an ordinary meaning, is what court do when they properly "disregard unconstitutional statutes when deciding the cases before them." Brief for Petitioner United States at 41, *United States v. Texas*, No. 22-58 (U.S. Sept. 12, 2022), 2022 WL 4278395.[17]

Thus, 38 U.S.C. § 7292 and the principles traceable to *Marbury* empower this court to hold § 5110 unconstitutional as applied and to disregard that statute in constructing a remedy. Likewise, § 7261(a)(3)(B) empowers the Veterans Court, for the reasons that we have explained, to carry out our remedy—*i.e.*, to compel VA to disregard

---

[17] That authority is independent of whether, as the government argued in *Texas*, the APA provision is limited so that it does not extend to vacating a regulation, a matter not at issue in the present case.

§ 5110 in determining the effective date of Mr. Taylor's benefits.

c

The government makes an unelaborated suggestion that separation-of-powers (seemingly to include Appropriations Clause) considerations stand in the way of awarding benefits contrary to § 5110's limits even when such limits are unconstitutional as applied. Sec'y En Banc Response Br. at 9, 42, 55, 57. It cites no support for that suggestion but merely refers back to the *Richmond* decision. And we reject the suggestion.

*Richmond* addressed only the use of a non-constitutional doctrine to override statutory limits on expenditures. It did not involve or address a context in which "a court orders expenditures for constitutional reasons." *Rochester Pure Waters District v. Environmental Protection Agency*, 960 F.2d 180, 184 & n.2 (D.C. Cir. 1992) (per curiam). The basis for a distinction is evident: The Constitution prevails over a conflicting statute, *see Marbury*, 5 U.S. (1 Cranch) at 178, whereas *Richmond* involved the quite different principle that the non-constitutional judicial doctrine of equitable estoppel does not prevail over a constitutional statute limiting payments from the public fisc.

The government points to no authority for the notion that a court is constitutionally forbidden to order the federal government to pay benefits to individuals, as a remedy, after finding unconstitutional a statutory limitation on payment of those benefits to those individuals. And the Supreme Court has approved of just such remedies, without suggesting a constitutional impediment. *See, e.g., Sessions v. Morales-Santana*, 582 U.S. 47, 74 (2017); *Califano v. Westcott*, 443 U.S. 76, 89–93 (1979); *Califano v. Goldfarb*, 430 U.S. 199, 202–04 (1977) (plurality opinion); *Jimenez v. Weinberger*, 417 U.S. 628, 637–38 (1974); *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, 529, 537–38 (1973); *Frontiero v. Richardson*, 411 U.S. 677, 690–91 (1973)

(plurality opinion). In particular, when a federal benefits statute is unconstitutionally underinclusive—*i.e.*, the statute's provisions appropriate benefits to certain recipients but not to others in violation of the Constitution—"there exist two remedial alternatives: a court may either declare [the statute] a nullity [by] order[ing] that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion." *Westcott*, 443 U.S. at 89 (quoting *Welsh v. United States*, 398 U.S. 333, 361 (1970) (Harlan, J., concurring)). And the Court has made clear that extension is in fact the preferred course: "Ordinarily, we have reiterated, 'extension, rather than nullification, is the proper course.'" *Sessions*, 582 U.S. at 74 (quoting *Westcott*, 443 U.S. at 89); *see also Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, 2354 (2020) (plurality opinion) ("The Court's precedents reflect th[e] preference for extension rather than nullification." (collecting cases)). If the extension is proper under established remedial principles,[18] then there is no constitutional obstacle to ordering monetary payments contrary to an unconstitutional statutory limit.

C

For the foregoing reasons, we conclude that § 5110 is unconstitutional as applied to Mr. Taylor to the extent that applying its provisions would deny Mr. Taylor the effective date of benefits that he would have had in the absence of the government's unconstitutional interference with his access to the VA adjudicatory system for vindicating his

---

[18] The Court's inquiry into what "the legislature would have willed had it been apprised of the constitutional infirmity," *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 427 (2010); *see Sessions*, 582 U.S. at 73, fits the general remedial inquiry into what the claimant's position would have been had there been no violation.

entitlement.  We are not persuaded by the dissent to conclude otherwise.

The dissent suggests that there is or should be a categorical exclusion of national-security government actions from the constitutional right of access.  Dissent at 3–6.  We see no logical or doctrinal basis for such an exclusion, for which the government has not presented any argument.  The Supreme Court's decision in *Christopher* points the other way.  As discussed above, although that case itself involved national-security government action, the Court applied right-of-access standards rather than declare the right categorically unavailable.  And the Supreme Court has elsewhere indicated that government action involving national security is subject to legal standards protecting access to courts.  *See supra* p. 47 (discussing *General Dynamics*).

What is required in this area is not categorical exclusion but application of the doctrinally required standards with the caution specifically required when national-security actions are at issue, as indicated in the authorities discussed in the dissent at 11–12.  We have exercised that caution.  But the government has fallen far short under those standards.  The government has effectively done nothing more than make an unelaborated invocation of national security, and it has provided no meaningful explanation of why it could not have provided a secrecy-preserving VA route for veterans like Mr. Taylor when it has provided such a route in a closely related context where military secrecy is at stake.  All we conclude is that this is not enough.

The dissent also suggests that there is or should be a categorical exclusion from the right of access for government actions that leave any forward-looking cause of action available even if the actions unjustifiably deprive the individual of a legal entitlement for an extended period—here,

up to roughly 35 years' worth of benefits. Dissent at 7–8; *id.* at 15 (relying on the same point in reasoning that we and the Veterans Court lack remedial authority here). We see no logical or doctrinal basis for such an exclusion, for which the government has not presented any argument. And the Supreme Court's decision in *Christopher* points the other way: The Court there defined the backward-looking category of right-of-access violations to cover government actions that "caused . . . the loss of an opportunity to seek some particular order *or relief*." 536 U.S. at 414 (emphasis added).

Seemingly with reference to military-secrecy oaths in general and standing alone, the dissent states that we have reached our conclusion "without any explanation that such an oath is 'undue.'" Dissent at 10. But the subject of this case is the particular oath demanded without accompaniment of a VA route for claim presentation and proof to vindicate an undisputed legal entitlement (based on readily foreseeable harm). We explain why the resulting interference with access is undue: The government has not provided any meaningful justification for the access foreclosure in the face of VA's provision of a VA route for claim presentation and proof in facially comparable circumstances involving national-security secrecy.

Two final points. Contrary to the expression of concern in the dissent at 4 n.2, we do not suggest, what would be topsy turvy, that the eventual declassification of the Edgewood program is itself part of the unconstitutional denial of access. *See supra* p. 44 (stating that the access "denial existed independently of the fact that secrecy was ultimately lifted"). And the dissent is contrary to the basic hierarchy of legal authority to the extent that it suggests that the Constitution is inapplicable if a substantive equitable doctrine is also inapplicable. Dissent at 17.

## VI

A majority of the court (as reflected in this opinion and the concurrence) agree, and the court holds, that when a veteran has been determined to be entitled to benefits for one or more disabilities connected to participation in the Edgewood program at issue, the required effective date of such benefits is the date that the veteran would have had in the absence of the challenged government conduct—imposition of the secrecy oath with no VA route for claim presentation and proof to vindicate the benefits entitlement. We reverse the decision of the Veterans Court and remand for expeditious proceedings to give Mr. Taylor relief pursuant to this holding.

Costs to Mr. Taylor.

**REVERSED AND REMANDED**

# United States Court of Appeals for the Federal Circuit

---

**BRUCE R. TAYLOR,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2019-2211

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 17-2390, Judge Joseph L. Falvey Jr., Judge William S. Greenberg, Judge Amanda L. Meredith.

---

DYK, *Circuit Judge*, concurring in judgment, with whom NEWMAN, REYNA, and WALLACH, *Circuit Judges*, join, and with whom STARK, *Circuit Judge*, joins as to Parts I, II, and V.

We agree with the result reached by the plurality but write separately because we think this case should properly be resolved on a non-constitutional ground of equitable estoppel.[1]   We have an obligation to avoid

---

[1]  We refer to the portion of Judge Taranto's opinion that rejects the approach of this concurrence as a majority

deciding constitutional questions when the case can be decided on other grounds. *See Bond v. United States*, 572 U.S. 844, 855 (2014). This is such a case. The government's conduct equitably estops it from limiting Mr. Taylor's recovery under 38 U.S.C. § 5110(a), and it is unnecessary to partially invalidate a federal statute to award relief to Mr. Taylor. This equitable estoppel ground is narrow, while the plurality's due process holding is of uncertain scope and future application.

I

As the majority describes, Mr. Taylor participated as a volunteer in a U.S. military program at the Edgewood Arsenal during September and October 1969 to test chemical weapons,[2] and as a result suffered service-connected disabilities that entitled him to veterans' benefits. Although discharged on September 6, 1971, suffering from disabilities and entitled to benefits as of that date, he did not apply for benefits until February 2007. Mr. Taylor waited to apply because his secrecy oath precluded him from providing information about his participation in the Edgewood program, and he apparently believed those disclosures were necessary to apply for benefits. Indeed, as discussed below, the application form for disability benefits at the time of his discharge required disclosure of the

---

opinion. We refer to the portion of Judge Taranto's opinion for a plurality of the court addressing the due process right of access as the plurality.

[2] The substance or substances to which Mr. Taylor was exposed appear to have been nerve agents. Their use in wartime was unquestionably illegal under existing international law in 1968 (e.g., the 1925 Geneva Gas Protocol). For a comprehensive history and analysis of these weapons, see Evan J. Wallach, *A Tiny Problem with Huge Implications—Nanotech Agents as Enablers or Substitutes for Banned Chemical Weapons: Is a New Treaty Needed?*, 33 Fordham Int'l L.J. 858 (2009).

nature of his disability despite the government's contention that Mr. Taylor could have filed a skeletal claim without disclosing confidential information. In June 2006, the government informed Mr. Taylor that he was free to disclose his Edgewood-related disabilities, and then in February 2007 he did so.

The Board of Veterans Appeals ("Board") found that under the statute he could not receive benefits before 2007 because § 5110(a)(1) provides that "the effective date of an award based on an initial claim, or a supplemental claim, of compensation . . . shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor." Under that provision, the Board concluded that Mr. Taylor's benefits were limited to the date of the receipt of his application in February 2007.

## II

Before the en banc court, Mr. Taylor contended that the government could not assert the time bar of § 5110(a) to prevent an earlier effective date under theories of equitable estoppel, equitable tolling, and constitutional due process. In a related case, *Arellano v. McDonough*, the Supreme Court held that equitable tolling was not available for § 5110, but left open the possibility that "other equitable doctrines, such as waiver, forfeiture, and estoppel" apply to the provision. 143 S. Ct. 543, 552 n.3 (2023). The Supreme Court did not mention a theory of constitutional due process.

Following *Arellano*, Mr. Taylor continued to argue for an earlier effective date based on equitable estoppel.

A

The doctrine of equitable estoppel "forms a very essential element in fair dealing, and rebuke of all fraudulent misrepresentation, which it is the boast of courts of equity constantly to promote." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011) (ellipses omitted) (quoting 2 J. Story, *Commentaries on Equity Jurisprudence* § 1533 (12th ed. 1877)). "He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned, for the law says to him, in effect: 'This is your own act, and therefore you are not damnified.'" *R.H. Stearns Co. v. United States*, 291 U.S. 54, 61 (1934) ((quoting *Dolan v. Rodgers*, 44 N.E. 167, 167 (N.Y. 1896); *Imperator Realty Co. v. Tull*, 127 N.E. 263, 266 (N.Y. 1920)). In *Heckler v. Community Health Services of Crawford County, Inc.*, the Supreme Court, while rejecting a claim of equitable estoppel in that case, made clear that equitable estoppel is in federal cases based on "traditional elements of an estoppel." 467 U.S. 51, 61 (1984). The Supreme Court adopted the approach to equitable estoppel of the Restatement (Second) of Torts. *See id.* at 59.

Under the Restatement standard, estoppel can provide relief when "one person makes a definite misrepresentation of fact to another person," *id.* (quoting Restatement (Second) of Torts § 894(1) (1974)), that other person "relied on its adversary's conduct in such a manner as to change [its] position for the worse[,] and that reliance [was] reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* (internal quotation marks and footnotes omitted). "[E]stoppel is appropriate even where 'the one making the representation believes that his statement is true.'" *Minard v. ITC Deltacom Commc'ns, Inc.*, 447 F.3d 352, 359 (5th Cir. 2006) (quoting Restatement (Second) of Torts § 894(1) cmt. b (Am. L. Inst. 1979)).

The traditional requirements for estoppel are uncontestably present. The government (both the Army and the Department of Veterans Affairs ("VA")) prevented Mr. Taylor from applying for veterans benefits by imposing a secrecy oath and by insisting that he could not file for benefits without the secret information. The Army also misleadingly advised him that medical benefits would be provided, *Viet. Veterans of Am. v. Cent. Intel. Agency*, No. C 09-0037 CW, 2013 WL 6092031, at *2 (N.D. Cal. Nov. 19, 2013) (noting that a 1953 Army memorandum provided that "[m]edical treatment and hospitalization will be provided for all casualties of the experimentation." (citation omitted)). The VA misled him by inaccurately advising him that he could not file a benefits claim without disclosing the nature of the injury and the date it began, when the government now contends that he could file a skeletal claim without disclosing confidential information. Mr. Taylor reasonably relied on the government's "conduct in such a manner as to change his position for the worse," *Heckler*, 467 U.S. at 59 (internal quotation marks and footnote omitted), both in participating in the program and in foregoing filing a claim before 2007.

The government does not appear to contest the fact that Mr. Taylor was prejudiced by the government's actions. In fact, the government appears not to dispute that equitable estoppel would apply in this situation save the bar presented by *OPM v. Richmond*, 496 U.S. 414 (1990).[3] The majority does not dispute this either. *See* Maj. Op. 19 ("For purposes of this case, we may assume— without deciding—that the government action that caused Mr. Taylor not to file a claim for decades would meet the

---

[3] To the extent that the government suggests that Mr. Taylor has not shown affirmative misconduct on the part of the government, it is clear that in this case there was affirmative misconduct.

standards for equitable estoppel if that doctrine were available for the money claim at issue in this case.").

## B

The government primarily argues that under *Richmond*, estoppel cannot apply against the government when a claimant seeks money from the Treasury. In *Richmond*, the Supreme Court held that "judicial use of the equitable doctrine of estoppel cannot grant . . . a money remedy that Congress has not authorized." 496 U.S. at 426. In that case, a government employee gave a federal retiree misinformation, including an outdated form, about his eligibility for a disability annuity, leading the retiree to earn too much money to receive the annuity for a six-month period. *Id.* at 417–18. The statute was clear that the retiree made too much, but the government employee who gave the advice relied on an outdated and incorrect version of the statute. *Id.* The Court held that because the retiree was statutorily ineligible to receive the annuity in that period, the misinformation provided by the government did not entitle the retiree to payment. *See id.* at 424, 434. The Appropriations Clause of the Constitution bars "unauthorized oral or written statements to citizens . . . obligat[ing] the Treasury for the payment of funds." *Id.* at 428.

The government argues that the meaning of § 5110(a)(1) is plain, and on its face bars Mr. Taylor from recovering benefits prior to the date of his filing, thus foreclosing such recovery under *Richmond*. *See* Gov't En Banc Br. 20–22. We do not agree that § 5110 bars Mr. Taylor from recovering retroactive benefits under a theory of equitable estoppel.[4]

---

[4] Judge Stark does not reach the interpretation of § 6303 because he reads § 5110(a)(1)'s general bar to benefits predating filing not to apply when government

TAYLOR v. MCDONOUGH

7

III

A

In *Richmond*, there was no contention that the agency had violated any statute, or that the government employee's actions were implementing an official agency policy. The majority here appears to agree that *Richmond* is no bar where a governmental agency violates a statutory

---

misconduct amounting to equitable estoppel prevents a claimant from filing. This footnote sets forth Judge Stark's views. "[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," and so "we must read the words in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 486 (2015) (internal quotation marks and citation omitted). "[W]hat is most telling here are the singular characteristics" of the "scheme that Congress created for the adjudication of veterans' benefits claims." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 440 (2011). Though its roots stretch back to World War I, the language of § 5110 (previously codified as § 3010) was brought into Title 38 in an act consolidating veterans' law, with its unique "solicitude for the claimant." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 311 (1985); *see* An Act to Consolidate into One Act All of the Laws Administered by the Veterans' Administration, and for Other Purposes, Pub. L. No. 85-857, 72 Stat. 1005, 1226–27 (1958). In Judge Stark's view, it is inconceivable that Congress intended § 5110(a)(1)—a provision designed to ensure that claimants timely seek benefits—to permit affirmative and egregious government misconduct to bar veterans from receiving decades of owed benefits. As such, Judge Stark believes giving Taylor an earlier effective date here is consistent with Congress's intent, and thus *Richmond* does not bar application of equitable estoppel. Judge Stark accordingly concurs in the judgment.

duty "and the agency's compliance with that statutory duty is properly understood to be a precondition to enforcing a benefit restriction stated in another statutory provision." Maj. Op. 26.[5]   We have previously held that when an agency of the government violates a statutory duty to a claimant's detriment, the government is estopped from withholding benefits that a claimant could have received absent government misconduct.   For example, we have repeatedly held that when the Office of Personnel Management ("OPM") violates its statutory duty to inform annuitants of their right to elect a survivor annuity, and there is evidence that the recipient would have so elected, the government's failure estops it from strictly enforcing a statutory election deadline.   *See Dachniwskyj v. OPM*, 713 F.3d 99 (Fed. Cir. 2013); *Nixon v. OPM*, 452 F.3d 1361 (Fed. Cir. 2006); *Hernandez v. OPM*, 450 F.3d 1332 (Fed. Cir. 2006); *Simpson v. OPM*, 347 F.3d 1361 (Fed. Cir. 2003); *Wood v. OPM*, 241 F.3d 1364 (Fed. Cir. 2001); *Vallee v. OPM*, 58 F.3d 613 (Fed. Cir. 1995); *Brush v. OPM*, 982 F.2d 1554 (Fed. Cir. 1992).   We have similarly held that when the government fails to notify a servicemember's spouse of the servicemember's decision to opt out of a survivor

---

[5]   The majority explains:

> After all, where one statutory provision imposes a duty on an agency, and the agency's compliance with that statutory duty is properly understood to be a precondition to enforcing a benefit restriction stated in another statutory provision, *Richmond* does not prohibit awarding the benefit without regard to the benefit restriction if the precondition duty is not fulfilled.   We have so held repeatedly.

Maj. Op. 26 (citing *Brush*, 982 F.2d 1554, *Dachniwskyj v. OPM*, 713 F.3d 99 (Fed. Cir. 2013), and *Johnston v. OPM*, 413 F.3d 1339, 1343 (Fed. Cir.), *opinion modified on reconsideration*, 430 F.3d 1376 (Fed. Cir. 2005)).

annuity benefit, as Congress requires, the government cannot enforce the opt-out decision. *See Kelly v. United States*, 826 F.2d 1049, 1052 (Fed. Cir. 1987); *Barber v. United States*, 676 F.2d 651, 657 (Ct. Cl. 1982). Finally, we have held that when the government fails to notify an employee of an unfavorable decision regarding the employee's ability to return to work after an injury, the government cannot deny an application for disability retirement benefits as untimely under 5 U.S.C. § 8337(b). *Johnston v. OPM*, 413 F.3d 1339, 1343 (Fed. Cir.), *opinion modified on reconsideration*, 430 F.3d 1376 (Fed. Cir. 2005).

As we explained in *Brush*, "there is no indication that . . . *Richmond* was meant to apply when an agency fails to carry out a statutory duty at a detriment to the other party and a benefit to itself." 982 F.2d at 1564. That is so because what Congress has authorized is a question of statutory interpretation, and statutory provisions must not be read in isolation. If the payment bar is inapplicable where the government violates its notice obligation, money is not being paid from the Treasury in violation of statutory requirements. "[T]o give effect, if possible, to every clause and word of [the] statute," we determined in *Brush* that the statutory election deadline gives way when OPM fails to notify an annuitant as required. *Brush*, 982 F.2d at 1563 (quoting *United States v. Menasche,* 348 U.S. 528, 538–39 (1955)). As in *Brush* and subsequent cases, *Richmond* is no obstacle here if the government's conduct violated a statute, and, as noted, the majority largely appears to agree.

B

On the face of it, the VA advised Mr. Taylor that he could not apply for benefits without disclosing confidential information. Because Mr. Taylor would have been applying for disability compensation, the VA form instructed him that "[d]isability compensation is paid for

10

disability resulting from service in the armed forces," VA Form 21-526 (1971/1972) at Instructions, and required him to disclose the "nature of sickness, disease or injuries for which this claim is made and date each began," *id.* at 2 (capitalization modified). The form required details of "treatment" received "while in service" related to the disability, including the dates and location of treatment and the organization at which the "sickness, disease, or injury was incurred." *Id.* at 3 (capitalization modified).[6] The VA further instructed veterans to "list persons other than physicians who know any facts about any sickness, disease, or injury" that was treated during service. *Id.* The government appears to agree that the form required disclosure of what Mr. Taylor was forbidden to disclose. *See* Gov't En Banc Br. 48.

C

By advising Mr. Taylor that he could not file a claim without disclosing his Edgewood experience, the government violated its obligations under 38 U.S.C. § 6303 to provide veterans with "full information" of available benefits, discussed below, a provision that was in effect when Mr. Taylor was discharged from service. *See* Veterans Education and Training Amendments Act of 1970, Pub. L. 91–219, § 241, 84 Stat. 76, 84 (codified as amended at 38 U.S.C. §§ 6301(a)(1), 6303(c)(1)(A)); *see also* 38 U.S.C. §§ 240–41 (1970) (current version at 38 U.S.C. § 6303).

The government appears to agree that Mr. Taylor could have received an earlier date by filing a minimal claim—a submission without disclosing classified material or the source of the injury. Then, when he was released from his

---

[6] Mr. Taylor received treatment for "an anxiety reaction" after his exposure to experimental chemicals in September 1969, presumably at Edgewood. En Banc Joint Appendix ("J.A.") 57.

secrecy obligation, he could have provided the necessary information and received compensation back to the date of discharge "without divulging classified information on the Edgewood Program." Gov't En Banc Br. 48. The government points out that the VA has more recently recognized just such a procedure in its Adjudication Procedures Manual, which allows veterans to provide information to support claims based on Special Operations, including covert military operations. And it maintains that, even before this procedure was adopted, Mr. Taylor could have filed a minimal claim to obtain the benefits of an earlier effective date. En Banc Oral Arg. at 35:00–38:36. But, significantly, the government agrees it did not advise Mr. Taylor that he could file such a minimal or placeholder claim. *See* Gov't En Banc Br. 10, 53 (conceding that the VA failed to "communicat[e] to Mr. Taylor that he could file a minimal claim"). To the contrary, as we have discussed, the VA benefits claim form, on its face, required the very disclosure Mr. Taylor was forbidden to make. *See* Appellant's Supp. En Banc Br. 10 ("In order to file a claim for benefits, Mr. Taylor would have had to disclose the very facts as to which the government swore him to secrecy.").[7]

---

[7] In his appeal to the Board, Mr. Taylor asserted that

[t]he VA/ United States Government bound the Veteran and all other Edgewood Veterans with a secrecy oath(s). This oath prevented these specific Veterans from filing a claim . . . , giving a statement in support of such claim, or working with heath care professionals for any injuries which resulted from their participation in the Edgewood Project . . . Even if the Veteran had chosen to risk prosecution for violating his oath, he would not have had access to the records of the tests. This would have prevented the Veteran from making a successful claim for benefits. The VA and/or

In short, rather than fulfilling its duty to notify Mr. Taylor of the placeholder possibility, the VA effectively told Mr. Taylor falsely that he could not seek disability compensation because he would violate his secrecy oath. Just as in our OPM cases, the government's violation of its statutory duty to provide veterans with "full information" of available benefits prevents it from enforcing the statutory deadline that would otherwise apply to Mr. Taylor's benefit claim. *See Dachniwskyj*, 713 F.3d at 102; *Simpson*, 347 F.3d at 1366–67.

IV

Both the majority and the government nonetheless argue that § 6303 does not solve the *Richmond* problem. *See* 496 U.S. at 426 (holding that "judicial use of the equitable doctrine of estoppel cannot grant . . . a money remedy that Congress has not authorized").

First, the majority and the government argue that § 6303 does not create an enforceable obligation, relying on our earlier cases in *Rodriguez v. West*, 189 F.3d 1351, 1355 (Fed. Cir. 1999), and *Andrews v. Principi*, 351 F.3d 1134, 1137 (Fed. Cir. 2003). In those cases, we held that § 6303[8]

---

DOD held all the cards necessary to make a claim for [Disability Compensation Benefits] stemming from the Edgewood Project. This oath kept Mr. Taylor quiet for decades.

En Banc J.A. 109–110.

In his briefing before a panel of this court, Mr. Taylor argued that "the U.S. Army[] injured Mr. Taylor while he was on active duty after compelling him to sign a secrecy agreement. This secrecy agreement effectively precluded him from filing an application for service-connected compensation for that injury." Appellant's Reply Br. 7.

[8] *Rodriguez* and *Andrews* discuss 38 U.S.C. § 7722, which contained the notice provision now located at § 6303.

did not provide a remedy even if government employees failed to inform potential beneficiaries about their benefit rights. But neither *Rodriguez* nor *Andrews* dealt with a situation like that presented here: the VA taking misleading official action through a formal document advising veterans of their rights. In *Rodriguez*, a claimant was misinformed by VA employees about her eligibility for benefits, delaying her application for benefits. *See* 189 F.3d at 1352. And in *Andrews*, apparently a VA employee failed to notify a veteran at the time of discharge about her eligibility for benefits. *See* 351 F.3d at 1136.

*Rodriguez* and *Andrews* are of course not binding on the en banc court. "Indeed, '[t]he province and obligation of the en banc court is to review the current validity of challenged prior decisions.'" *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316 (Fed. Cir. 2013) (alterations in original) (quoting *United States v. Aguon*, 851 F.2d 1158, 1167 n. 5 (9th Cir.1988) (en banc), *rev'd on other grounds*, *Evans v. United States*, 504 U.S. 255 (1992)); *see id.* (panel decisions can be "changed by the court sitting en banc"). In particular, this court sitting en banc is not bound by sweeping statements regarding what a statute "appear[s] to be." *Rodriguez*, 189 F.3d at 1355.

But there is no need to overrule these decisions. *Rodriguez* and *Andrews* do not prevent us from interpreting § 6303 as imposing an enforceable obligation here. While the government cannot "be expected to ensure that every bit of informal advice given by its agents in [a complex administrative] program will be sufficiently reliable," *Heckler*, 467 U.S. at 64, and § 6303 may not be violated when agency employees fail to perform the duties imposed on them by the agency, it is surely violated when the agency as a matter of official policy fails to comply with its own statutory obligations.

Congress's notice requirements bear the hallmarks of an enforceable provision. Under § 6303, "[t]he Secretary

<u>shall</u> distribute full information to eligible veterans" about the services they are owed, and "<u>shall</u> provide, to the maximum extent possible, aid and assistance . . . to . . . veterans . . . in the preparation and presentation of claims under laws administered by the [VA]." § 6303(c)(1)(A), (d) (emphasis added). Congress gave particular attention to the VA's official communications with veterans, providing that the VA "<u>shall</u> by letter advise each veteran at the time of the veteran's discharge or release from active . . . service (or as soon as possible after such discharge or release) of all benefits and services under laws administered by the [VA] for which the veteran may be eligible." § 6303(b) (emphasis added). In formulating the statute, Congress repeatedly used the mandatory language "shall," *see* § 6303(a)–(e), and, to resolve any doubt, explained that "the outreach services program authorized by this subchapter is for the purpose of charging the [VA] with the <u>affirmative duty</u> of seeking out eligible veterans . . . and providing them with such services," 38 U.S.C. § 6301(a)(2) (emphasis added). *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599 (1999) (distinguishing "hortatory" provision containing the aspirational "should" with a provision including the "mandatory language" of "shall").[9]

Nor is § 6303 the type of procedural requirement that courts sometimes deem unenforceable, like those directing agencies to complete tasks by a certain time. *See Bullock v. United States*, 10 F.4th 1317, 1322 (Fed. Cir. 2021); *see also* Charles H. Koch, Jr. & Richard Murphy, 4 *Admin. L. & Prac.* § 11:43 (3d ed. 2023) (the default rule is that "[a]gency action will be set aside if undertaken without complying with relevant procedures"). We are "reluctant to treat statutory terms as surplusage in any setting," *TRW*

---

[9]    *See also Aspen Consulting, LLC v. Sec'y of Army*, 25 F.4th 1012, 1016 (Fed. Cir. 2022) ("shall" is "mandatory language"); *Piano Factory Grp., Inc. v. Schiedmayer Celesta GmbH*, 11 F.4th 1363, 1371 (Fed. Cir. 2021) (same).

*Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted), and are directed to "give effect to every clause and word" Congress has enacted, *Setser v. United States*, 566 U.S. 231, 239 (2012) (internal quotation marks, citation, and ellipses omitted). If § 6303 means anything, it must bar the VA from misleading veterans in official documents, thereby preventing them from accessing the benefits they are due. The government's view to the contrary would render § 6303 a nullity.

Second, the majority, but not the government, argues that Congress somehow approved of our decisions in *Rodriguez* and *Andrews* by reenacting the statute after we rendered those decisions. *See* Maj. Op. 30–31. There is not the slightest indication that in reenacting § 6303 Congress was aware of our decisions, nor that it considered the notice problem to which those decisions were directed. Under such circumstances, reenactment carries little weight. *See Schism v. United States*, 316 F.3d 1259, 1295 (Fed. Cir. 2002) (en banc) ("[T]he Supreme Court has repeatedly cautioned against using congressional silence alone to infer approval of an administrative interpretation."); 2B *Sutherland Statutory Construction* § 49:8 (7th ed. 2023) (the reenactment canon "does not apply where a legislature paid no attention to [the judicial] interpretation during reenactment.").

For example, in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, the Supreme Court rejected an argument that "Congress'[s] silence when it re-enacted [a] statute" conveyed Congressional approval of earlier lower-court cases in the absence of "direct evidence that Congress ever considered the issue . . . or voiced any views upon it." 401 U.S. 321, 336 n.7 (1971). Similarly, the Court has rejected the notion that there is a "judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it" when Congress silently reenacts a statute following "a smattering of lower court opinions" interpreting it. *BP P.L.C. v. Mayor & City Council of*

*Baltimore*, 141 S. Ct. 1532, 1541 (2021) (citation omitted). The reenactment canon is premised on Congress knowingly adopting a judicial interpretation, *see Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2365 (2019), and there is simply no reason to think that Congress knew about *Rodriguez* or *Andrews*.

Third, the majority, but not the government, argues that § 6303 does not affect the time bar of § 5110 because the provisions are insufficiently interconnected. *See* Maj. Op. 29–30 & n.7. But the provisions are in fact closely linked. Both provisions appear in Title 38 dealing with veterans' benefits. More importantly, the VA's outreach duty in § 6303 is logically connected to the benefit time bar of § 5110. If a veteran does not know about his benefits, he will not file, and if he does not file, he does not accrue benefits. The relationship between these provisions is at least as strong as that between provisions we have previously read together for equitable purposes. In *Johnston v. OPM*, for example, we held that if the Army Corp of Engineers violated its statutory duty to inform the plaintiff that it was terminating him, he would be excused his late filing for disability retirement benefits. *See* 413 F.3d at 1341–42.[10] Like §§ 6303 and 5110, the linked statutory provisions in *Johnston* do not cite or reference one another, and are codified in different chapters in the United States Code. *See* 5 U.S.C. §§ 7513, 8337. We read those provisions together because the agency's duty to give notice of termination is logically linked to the former employee's notice to timely seek retirement benefits. *See Johnston*, 413 F.3d at 1342. The same reasoning applies here.

---

[10]    In *Johnston* we also considered the government's regulatory duty to inform the plaintiff of his eligibility for disability retirement benefits, *see id.*, but regulatory authority has no obvious role in the *Richmond* analysis.

Fourth, the government, but not the majority, argues that it would be unworkable to notify veterans of their ability to file a minimal, unclassified claim. As noted earlier, the VA has recognized that this is feasible and has implemented a procedure allowing veterans involved in covert military operations to provide information to support claims. In 2006 the VA changed its rules to provide that the agency will reconsider claims after receiving previously unobtainable evidence, including "[d]eclassified records that could not have been obtained because the records were classified when VA decided the claim." New and Material Evidence, Final Rule, 71 Fed. Reg. 52,455, 52,457 (Sept. 6, 2006) (codified at 38 C.F.R. § 3.156(c)(1)(iii)).[11] In such cases, the date the VA received the earlier placeholder claim can mark the effective date. *See* § 3.156(c)(3). So not only was it possible for the government to alert veterans of the possibility of filing minimal claims, but the VA has done so for more than 15 years. *See also* Transcript of Oral Argument at 29:5–7, *Arellano*, 143 S. Ct. 543 (government counsel stating that "the agency itself has taken a couple of steps to handle cases like" the Edgewood veterans); *id.* at 29:21–30:9 (counsel stating that § 3.156(c) "ma[kes] explicit" that submission of minimal claims is permissible).

Fifth, the government, but not the majority, argues that this approach is barred by *Arellano* because in *Arellano* the Court determined that the structure of § 5110 makes clear that equitable remedies are unavailable to toll the statute of limitations, assuming it is one, in § 5110. *Arellano* held that equitable tolling is unavailable under § 5110. *See Arellano*, 143 S. Ct. at 552. The government

---

[11] The regulation was adopted in September 2006 and became effective the following month. *See* 71 Fed. Reg. at 52,455. Mr. Taylor received his letter permitting him to disclose his Edgewood injuries in June 2006, and he applied for disability compensation in February 2007.

18

argues that § 5110 similarly bars equitable estoppel, but the two are quite different. Equitable tolling pauses the statute of limitations where "a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Id.* at 547 (citation omitted). Equitable estoppel, on the other hand, is premised on the defendant's misconduct. *See Heckler*, 467 U.S. at 59. Importantly, well aware of this case on the horizon, *see* Transcript of Oral Argument at 28:18–24, *Arellano*, 143 S. Ct. 543, the Court explicitly left open the possibility that equitable estoppel may apply to § 5110, *see Arellano*, 143 S. Ct. at 552 n. 3.[12]

In short, § 6303 was violated by the VA in this case. This violation bars the government from enforcing the time bar of § 5110 in Mr. Taylor's case, and Mr. Taylor is entitled to retroactive benefits.

V

This is a challenging case, and we agree with the plurality that Mr. Taylor and others similarly situated are owed retroactive benefits. But we think this case should be decided on equitable estoppel grounds rather than constitutional grounds, and respectfully concur only in the judgment.

---

[12]    The government contends that the Army and the VA should be treated as separate entities. But both agencies are part of the same government. Here, moreover, there is evidence of substantial coordination between the agencies. *See* En Banc J.A. 32–33. Under these facts at least, the VA and the Army can appropriately be treated as a single governmental entity.

# United States Court of Appeals
# for the Federal Circuit

---

**BRUCE R. TAYLOR,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF
VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2019-2211

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 17-2390, Judge Joseph L. Falvey Jr., Judge William S. Greenberg, Judge Amanda L. Meredith.

---

HUGHES, *Circuit Judge*, dissenting in part and dissenting from the judgment, with whom LOURIE, *Circuit Judge*, joins.

The government has treated Bruce Taylor and other Edgewood program volunteers unfairly, subjecting them to harmful experiments and then failing to provide the most basic form of redress for the harm that the government inflicted. Congress can provide, and should have immediately provided, a remedy to Mr. Taylor and the other Edgewood volunteers by passing a statute that, at a minimum, allows the Secretary to award Edgewood volunteers an effective date corresponding to each veteran's date of discharge. I

agree with and join Parts I–IV of Judge Taranto's opinion. Those sections explain in detail why equitable estoppel cannot be applied to overcome 38 U.S.C. § 5110 to grant Mr. Taylor an earlier effective date, and why there is no statutory remedy for Mr. Taylor under 38 U.S.C. § 6303.

But having exhausted these first two theories, Part V of Judge Taranto's opinion ("the plurality") finds a right of access violation in Mr. Taylor's case to construct a remedy. In doing so, the plurality expands the right of access precedent in a way that infringes on the Executive's broad national security powers. Because the government did not violate Mr. Taylor's right of access and because, even if it had, our court has no equitable or statutory authority to remedy such a violation, I respectfully dissent from Parts V–VI and from the judgment.

I

When the right of access doctrine is properly applied to Mr. Taylor's case, it is clear that the government's imposition of a secrecy oath was entirely within its constitutional authority and obligation. There can be little dispute that the Executive Branch has the broad authority to protect national security information and to impose prohibitions on the disclosure of that information. *Trump v. Hawaii*, 138 S. Ct. 2392, 2422 (2018) (recognizing the Executive's broad authority over "sensitive and weighty interests of national security and foreign affairs" (internal quotation mark omitted)). And once it has done so, the Judiciary has no business second-guessing the Executive's determinations. *Id.* ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on [matters of national security], all of which are delicate, complex, and involve large elements of prophecy." (internal quotation marks omitted)).

A

The fundamental problem with the plurality's analysis is its extension of the constitutional right of access doctrine to Mr. Taylor's case in the first place. None of the right of access cases cited by the plurality involve the Executive's broad discretion over the military and national security affairs. And there is good reason for that—the right of access cases require the court to subject the governmental decision at issue to strict scrutiny, *i.e.*, whether the government has a compelling interest and whether it was narrowly tailored. But such a searching inquiry is incompatible with the Executive's broad authority in national security affairs. And even if the doctrine could be expanded to cover Mr. Taylor's case, any finding that the government unduly interfered with his right of access to the VA would require us to second-guess the Executive's national security decision that the Edgewood program needed to be kept confidential even from the VA.

1

The plurality assumes, without explanation, that the right of access line of cases, which deal with affirmative acts of government misconduct, can simply be extended to government decisions involving national security. Plurality Op. at V.B.1. But that assumption is wrong. There is no precedent for applying the right of access doctrine to decisions taken by the government in furtherance of its national security interest, and I disagree with the plurality's unsupported attempt to extend the doctrine here.

The government's act of securing a secrecy oath in order to protect delicate national security information is simply not the type of affirmative misconduct that occurred

4                                                    TAYLOR v. MCDONOUGH

in most of the cases cited by the plurality.[1] Instituting a secrecy oath in furtherance of national security concerns cannot be compared to the types of government actions that took place in those cases, because those cases all involved allegations of government misconduct or other types of illegal or improper action.[2]

---

[1]    It is important to separate the government's institution of the Edgewood program from the specific actions that prevented Mr. Taylor and other Edgewood veterans from accessing the VA. Any wrong that the government committed stems from the government establishing and overseeing the Edgewood program, not the secrecy oath. There is no question that, in retrospect, the Edgewood program appears excessive and unwarranted, but it is not cognizable under a right of access theory because the program *itself* did not prevent Mr. Taylor from accessing the VA. Rather, the only government act that prevented Mr. Taylor from accessing the VA was when it instituted the secrecy oath that prohibited him from discussing his involvement in the Edgewood program.

[2]    The plurality opinion raises the question of whether the right of access violation stems from the secrecy oath itself, or from the government's decision to declassify the Edgewood program without a statutory remedy establishing an earlier effective date for a VA claim. The plurality opinion seems to suggest that it was the act of *declassifying* the Edgewood program, thereby allowing Mr. Taylor and other similarly situated veterans to eventually pursue claims, that somehow contributed to an act of government misconduct because it was this act of declassification that ultimately opened the government to increased liability. I am greatly concerned by that implication because that could discourage the government from declassifying programs in the future for fear of similar claims.

For example, several of the cases involve actions taken by corrections officials that specifically impeded inmates' access to the courts. *E.g.*, *Lewis v. Casey*, 518 U.S. 343, 347 (1996) (involving allegations by a group of inmates that prison officials denied them physical access to the law library and refused translation assistance to non-English-speaking inmates); *Bounds v. Smith*, 430 U.S. 817, 818–20 (1977) (involving similar allegations about prison officials denying inmates physical access to the law library); *Silva v. Di Vittorio*, 658 F.3d 1090, 1095–96 (9th Cir. 2011) (involving allegations that prison officials needlessly transferred Mr. Silva to different facilities and destroyed certain legal documents), *overruled on other grounds by Richey v. Dahne*, 807 F.3d 1202, 1209 (9th Cir. 2015). Other cases relied on by the plurality involve equally egregious allegations of government misconduct that directly impeded plaintiffs' right of access to the courts, such as police misconduct directed at claimants or employees. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 383–84 (2011) (involving allegation of denial of overtime and punitive performance directives in response to union grievance); *Tennessee v. Lane*, 541 U.S. 509, 514 (2004) (involving allegations that a state courthouse refused to accommodate a claimant's mobility disability and forced him to crawl up the courthouse stairs); *Swekel v. City of River Rouge*, 119 F.3d 1259, 1260 (6th Cir. 1997) (involving allegations that police precinct covered up evidence from a car accident involving the son of a police officer). And even in *Christopher v. Harbury*, a case that the plurality heavily relies on, the underlying government misconduct involved allegations that the government made affirmative statements and omissions that misled Ms. Harbury about whether her husband was still alive after he had been captured, detained, tortured, and used as an informant by the CIA. 536 U.S.

403, 406 (2002).[3] While I agree with the plurality opinion that a right of access claim does not require a showing of intent, all of these cases have a common theme: the alleged conduct—whether the government intended it to or not—directly impeded access to the courts.

By contrast, establishing a secrecy oath for a classified military program does not come close to the type of affirmative misconduct that courts have found contribute to violating a plaintiff's right of access. And the plurality does not explain why establishing a secrecy oath is equivalent to the types of government misconduct that took place in the cases it relies on. Nor can it, because any finding that a secrecy oath, elicited to protect delicate national security information, constitutes government misconduct would require courts to question the Executive's broad authority over matters concerning national security. The Supreme Court has made it clear that judicial bodies should not substitute their judgment for that of the Executive in matters of national security. *Hawaii*, 138 S. Ct. at 2422. But by assuming that the secrecy oath constitutes government misconduct, the plurality does just that. Because a secrecy oath does not constitute the kind of government misconduct contemplated in the right of access line of cases, the plurality's extension of the right of access doctrine to Mr. Taylor's case is improper. A decision rooted in national security policy, such as the secrecy oath here, should not be the basis for a denial of access claim.

Yet another reason the right of access doctrine should not extend to the facts of Mr. Taylor's case is that, unlike

---

[3]    It is also worth mentioning that the Supreme Court did not even find a right of access violation despite the serious allegations of misconduct. *Christopher*, 536 U.S. at 418 ("Harbury's complaint did not come even close to stating a constitutional claim for denial of access upon which relief could be granted.").

in the right of access cases cited by the plurality, he did ultimately gain access to the VA and was provided the full scope of benefits allowed under § 5110. It is just that his right of access claim stems from the theory that the remedy he was granted was not enough, since Mr. Taylor's benefits accrued from the date of his application, rather than the date he was discharged. The plurality relies on *Christopher* for the proposition that, particularly for backwards-looking right of access violations, the plaintiff must "identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." Plurality Op. at 35 (quoting *Christopher,* 536 U.S. at 415). But just because Mr. Taylor requested an earlier effective date to expand his award of benefits does not make his request the appropriate remedy. None of the right of access cases the plurality cites grant relief that involves expanding the amount of damages or benefits available to a plaintiff despite a potential right of access violation. Of the few cases the plurality cites where courts granted some sort of remedy in light of a potential right of access violation, the remedy was ordinarily allowing the plaintiff's claim to go forward at all. *E.g.*, *Lane*, 541 U.S. at 515, 533–34 (affirming the denial of the government's motion to dismiss a claim under the Americans with Disabilities Act); *Ringgold–Lockhart v. Cnty. of Los Angeles*, 761 F.3d 1057, 1067 (9th Cir. 2014) (vacating and remanding the district court's grant of the government's motion to dismiss in light of a potential right of access violation). But none of these cases involved expanding the amount of benefits or damages available to the plaintiff. This further underscores how the remedy granted by the plurality is unsupported by any statutory or legal authority.

Furthermore, the effective-date limitations of § 5110 do nothing more than set a temporal limit on Mr. Taylor's benefits. They do not deny him administrative access. In a sense, § 5110's effective-date limitations are like a statute of limitations. A statute of limitations might, as its name

implies, limit a plaintiff's remedy by preventing the plaintiff from raising untimely claims. But we would never characterize the applicable statute of limitations as denying that plaintiff access to the courts. Rather, we would analyze whether "the defendant['s] actions foreclosed [the plaintiff] from filing suit in . . . court or rendered ineffective any . . . court remedy she previously may have had," and then we would "address [any] pre-filing abuses by tolling the statute of limitations." *Swekel*, 119 F.3d at 1263–64.

Thus, I would find that the right of access doctrine does not apply to Mr. Taylor's case, and therefore I would not find a right of access violation here.

2

For many of the same reasons discussed above, I would also find that the right of access doctrine is inapplicable here because the government's actions did not constitute active, undue interference, as required by the right of access line of cases that the plurality relies on. Even if the plurality is correct that a national security determination can form the basis for a right of access claim, a plaintiff's right of access is not unconditional. To violate a plaintiff's right of access, the government must have engaged in active, undue interference that deliberately shuts out the plaintiff from an institution. *See Christopher*, 536 U.S. at 414–15.[4] I would conclude that the government did not

---

[4]    The active, undue interference standard is typically used in incarcerated-persons cases, as articulated by the Ninth Circuit. Claimant-Appellant's En Banc Br. 55 (citing *Silva*, 658 F.3d at 1103). I analyze this standard because it is the most coherent test that the parties present, and both parties believe that this standard is not meaningfully different than the tests used in non-incarcerated-persons cases. Claimant-Appellant's En Banc Br. 55; Respondent-Appellee's En Banc Br. 46–47, 47 n.8.

engage in the kind of active, undue interference that took place in the right of access cases on which the plurality relies.

Mr. Taylor asserts that the government engaged in active, undue interference because the government denied him an opportunity to present his disability claim from September 1971, the date of his discharge, to February 2006, the date he was allowed to disclose his participation in the Edgewood program. Claimant-Appellant's En Banc Br. 49–50, 56. Mr. Taylor argues that "even a delay of access[] may constitute a constitutional deprivation." Claimant-Appellant's En Banc Br. 56–57 (quoting *Jackson v. Procunier*, 789 F.2d 307, 311 (5th Cir. 1986)). The government responds that any interference was not "undue" because the government was "protecting classified information." Respondent-Appellee's En Banc Br. 52. According to the government, "the [secrecy] oath was not designed to preclude Mr. Taylor from obtaining benefits, but rather to protect classified information." Respondent-Appellee's En Banc Br. 54.

I do not deny that the secrecy oath prohibited Mr. Taylor from filing his claim earlier than 2006, and that therefore, the secrecy oath interfered with Mr. Taylor's right of access to adjudication. But even if the government did interfere with Mr. Taylor's ability to access the VA, that interference was not "undue" because establishing a secrecy oath cannot in any way be considered illegal or improper. I acknowledge that the relevant cases have not sufficiently delineated the boundaries of what actions are "undue" in the context of right of access cases. But under its plain meaning, I do not think the government's actions were "[e]xcessive or unwarranted." *Undue*, BLACK'S LAW DICTIONARY (11th ed. 2019). The plurality does not explain why the secrecy oath required of Edgewood veterans improperly exceeds the Executive's broad authority over national security concerns. The plurality chastises the government for securing a secrecy oath "backed by court-

martial and prosecution threats," Plurality Op. at 37, and merely assumes without any explanation that such an oath is "undue." But eliciting a secrecy oath from Edgewood veterans is entirely the type of delicate national security decision that lies firmly within the purview of the Executive; it is not our place to second-guess that determination. As a judicial body, we lack the full scope of information and the competence to question the propriety of the secrecy oath—as the plurality admits, we do not even have the text of the secrecy oath that Mr. Taylor signed before us. Plurality Op. at 7. To then conclude that the secrecy oath constitutes "undue" interference is speculative and an overreach of our judicial decision-making. Thus, I would conclude that the government's adoption of a secrecy oath was not undue interference and accordingly did not violate Mr. Taylor's right of access to the VA.

B

Putting aside whether the right of access doctrine applies in the first place, the plurality also argues that the government's actions do not pass muster under the strict scrutiny standard because the secrecy oath was not narrowly tailored to serve its compelling interest in national security. Plurality Op. at 45–49. For the reasons discussed above, I do not think we should reach the question of whether the government's actions pass strict scrutiny because the right of access theory should not be extended to national security cases such as Mr. Taylor's. But even if the plurality is correct that the government's actions should be subject to strict scrutiny because of the fundamental right to access the courts, courts have also acknowledged that compelling state interests can justify interfering with a claimant's right of access. *See Ryland v. Shapiro*, 708 F.2d 967, 972 (5th Cir. 1983). Accordingly, I further disagree with the plurality that the secrecy oath constituted "undue" interference with Mr. Taylor's right of access because the government's actions here are not unconstitutional even under a strict scrutiny standard.

The Supreme Court has repeatedly recognized "the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business." *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988); *see also In re Nat'l Sec. Letter*, 33 F.4th 1058, 1072 (9th Cir. 2022). In particular, "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Egan*, 484 U.S. at 529. Accordingly, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530 (citing cases); *see United States v. Zubaydah*, 142 S. Ct. 959, 967 (2022) (reiterating that courts should not interfere with the "authority of the Executive in military and national security affairs"). Furthermore, while agency actions are presumptively reviewable, this presumption "runs aground when it encounters concerns of national security." *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 181 (3d Cir. 2010) (quoting *Egan*, 484 U.S. at 527). And most importantly, the courts "cannot substitute [their] own assessment for the Executive's predictive judgments" on matters of national security. *Hawaii*, 138 S. Ct. at 2421; *see also Int'l Refugee Assistance Prog. v. Trump*, 961 F.3d 635, 652 (4th Cir. 2020).

However horrible the Edgewood program may appear to have been in retrospect, at the time the government instituted a secrecy oath for participants, it implicated delicate national security concerns, and the government asserts that it "has a compelling interest in protecting . . . the secrecy of information important to our national security" by requiring participants to sign secrecy oaths. Respondent-Appellee's En Banc Br. 58–59 (quoting *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980)). The government easily meets the compelling interest prong of the strict scrutiny test, and the plurality does not deny this.

On the narrowly tailored prong, asking Mr. Taylor and other Edgewood participants to sign a secrecy oath limiting their ability to disclose details of the program falls squarely within the umbrella of narrowly tailored conduct that furthers a compelling government interest. *See In re Nat'l Sec. Letter*, 33 F. 4th at 1073. The plurality suggests that the government could have provided a more limited secrecy oath that would have provided Edgewood veterans with an adjudication while simultaneously maintaining military secrecy. Plurality Op. at 47–48. While it may have been theoretically *possible* to set up such a system, that is not the correct question. *In re Nat'l Sec. Letter*, 33 F. 4th at 1073 (noting that strict scrutiny requires that a restriction "be narrowly tailored, not that it be perfectly tailored" and that courts "should decline to wade into the swamp of calibrating the individual mechanisms of a restriction") (cleaned up). As the plurality observes and as the government acknowledges, there are other instances of benefits programs that involved classified information. Plurality Op. at 48–49. But the plurality's reference to these other benefits programs presupposes that the national security concerns applicable to Edgewood are identical to those raised in the other programs. It also assumes that the government had the ability to set up similar programs back in 1971. But we have no adequate basis to make those determinations. Just because the government has allowed classified information to be used in some administrative benefits programs does not mean the government is compelled to do so—or even able to do so—in all cases. Presumably, there is some information so sensitive that the government could decide the risk of exposure is so great that it cannot be shared outside the specific program, even to the VA.

Furthermore, the plurality's analysis implies that, before the government takes any action to control the dissemination of information in furtherance of its national security interests, it must have the foresight to predict

whether and how that information might need to be disclosed in order to access benefits and services from *any* government agency. This is an extraordinary burden to place on the Executive and on any agencies involved in military operations. *Harbury*, 536 U.S. at 422–23 (Thomas, J. concurring) ("I find no basis in the Constitution for a 'right of access to courts' that effectively imposes an affirmative duty on Government officials . . . to disclose matters concerning national security[.]").

In this case, the government made the choice to impose a restrictive secrecy oath. I see nothing in that choice that was beyond its authority and no reason for us to second guess that choice. The plurality's conclusion that the government could have adopted less-restrictive measures than the secrecy oath as it was provided to Mr. Taylor is based on nothing more than speculation and hindsight. By determining that the government could have structured the secrecy oath in such a way as to allow veterans to disclose the nature of the Edgewood program to the VA, the plurality is acting in place of the Executive and questioning the government's determination that information about the Edgewood program could not be disclosed to other government agencies without compromising national security. This type of substituted judgment by a judicial forum is precisely what the Supreme Court and other courts have said is inappropriate. *E.g.*, *Hawaii*, 138 S. Ct. at 2422. Instead, I would defer to the government's assessment that prohibiting Edgewood volunteers from disclosing their involvement in the program to the VA was necessary for national security reasons, and I would conclude that the government passes strict scrutiny by raising a compelling governmental interest and by narrowly tailoring the adoption of a secrecy oath to furthering the compelling governmental interest.

14                                    TAYLOR v. MCDONOUGH

## II

Even if the government did unduly interfere with Mr. Taylor's right of access, we do not have the authority to authorize the remedy the plurality grants—waiver of § 5110 to expand the benefits available to Mr. Taylor. In a typical right of access case, the court will identify an interfering government action that results in an unavailable or incomplete remedy. The court will then use a statutory or equitable power to grant the plaintiff a cause of action. But that it not what the plurality does here. Instead, the plurality ignores the fact that Mr. Taylor *did*, in fact, have access to the adjudicatory system of the VA, and disregards statutory authority by expanding the time frame that his claim covers, thereby expanding his benefits. In my opinion, we do not have any authority to grant this type of unprecedented remedy.

Ordinarily, when courts determine that the government has unduly interfered with a plaintiff's right of access to adjudication, they grant a remedy that essentially re-establishes the plaintiff's right of access to courts. Normally, that remedy is granting the plaintiff a cause of action to bring their case. For example, in *Delew v. Wagner*, the Ninth Circuit determined that "[t]he Delews have indeed alleged a constitutional violation, namely, that the defendants violated the Delews' right of meaningful access to the courts by covering up the true facts surrounding Erin Rae Delew's death." 143 F.3d 1219, 1222 (9th Cir. 1998). Identifying a possible interfering government action, the Ninth Circuit turned to the appropriate statutory remedy and concluded that "the Delews' complaint alleges a cognizable claim under" 42 U.S.C. § 1983, which explicitly allows an individual to sue any person who deprives that individual "of any rights, privileges, or immunities secured by the Constitution and laws" while acting "under color of" state or territorial law. *Id.*; *see also Moon v. El Paso*, 906 F.3d 352, 358 (5th Cir. 2018) ("We agree with the district court that Moon's access-to-courts claim is time-barred. Because

this claim is brought under § 1983, the federal accrual law governs . . . ."). The Ninth Circuit has also indicated that right of access claims are cognizable under other statutes—like 28 U.S.C. § 2244(d)(1)(B), which extends a limitations period when a state action unconstitutionally impedes a habeas-corpus applicant from filing an application—or under a court's equitable powers like equitable tolling. *Whalem/Hunt v. Early*, 233 F.3d 1146, 1148 (9th Cir. 2000); *see also Swekel*, 119 F.3d at 1264 ("In most instances, state courts can address pre-filing [right of access] abuses by tolling the statute of limitations or allowing for a 'spoliation of evidence' lawsuit.").

But here, the plurality deviates from how courts have ordinarily remedied violations of the right of access to courts, as I discussed *supra* at I.A.2. In my opinion, this deviation results from the fact that, unlike in other right of access cases, Mr. Taylor *did* ultimately access the VA and *did* receive benefits precisely in accordance with § 5110. But because the benefits Mr. Taylor received were limited by the secrecy oath, the plurality concludes that § 5110 is unconstitutional as applied to Mr. Taylor, and grants Mr. Taylor an earlier effective date. That decision lies far outside our judicial authority because no statute or other legal authority allows the Veterans Court or this court to grant Mr. Taylor an earlier effective date.

The plurality erroneously relies on the Veterans Court's statutory authority to "hold unlawful and set aside decisions, findings, conclusions, rules, and regulations issued or adopted by the Board found to be contrary to constitutional right, power, privilege, or immunity." 38 U.S.C. § 7261(a)(3) (cleaned up); Plurality Op. at 52–53. The plurality asserts that § 5110, as applied to Mr. Taylor, is unconstitutional, so the plurality therefore instructs the Veterans Court to set aside the Board's decision. Plurality Op. at 55, 57. But § 5110 is not unconstitutional, either on its face or as applied to Mr. Taylor. Section 5110 is clearly constitutional on its face; it gives, rather than denies,

16                                    TAYLOR v. MCDONOUGH

veterans access to a government institution. And the effec-
tive-date limits established by § 5110 are constitutional as
applied to Mr. Taylor; those effective-date limits did not
prevent Mr. Taylor from accessing the VA, but merely set
boundaries on the statutory benefits that he can receive.

I also question whether we can truly characterize
Mr. Taylor's current effective date as an incomplete rem-
edy. Section 5110 authorizes benefits from "the date of the
filing of the initial application" and further states that ben-
efits shall not be awarded for any time period "earlier than
the date of receipt of application therefor." 38 U.S.C.
§ 5110(a)(1)–(2). This is exactly what Mr. Taylor received—
he applied for benefits in 2007, and he was awarded bene-
fits from the date his application was filed. Were it not for
the particular nature of the Edgewood program and the in-
juries that Mr. Taylor sustained as a result, his case would
present nothing more than a routine application of § 5110.
But the plurality points to *no* statute or other legal author-
ity for awarding Mr. Taylor an earlier effective date in clear
contravention of the plain language of § 5110. There is no
question that under the applicable statute, Mr. Taylor re-
ceived the full remedy available to him—benefits from the
date of his application. To hold otherwise would deny Con-
gress the ability to set boundaries on its statutorily created
programs. The authority to grant Mr. Taylor and other
similarly situated veterans with an earlier effective date,
despite the temporal limits of § 5110, lies with Congress
and Congress alone.

Because § 7261(a)(3) does not reach the government's
institution of a secrecy oath and because the Board's appli-
cation of § 5110 was not unconstitutional as applied to
Mr. Taylor, I would find that the government did not un-
duly interfere with Mr. Taylor's access to the VA or other-
wise violated his right of access. Accordingly, I disagree
with the plurality's application of § 7261(a)(3) to circum-
vent § 5110, and I disagree that § 5110 is unconstitutional
as applied to Mr. Taylor.

## III

Ultimately, the plurality's right of access theory and associated remedy is nothing more than equitable tolling or estoppel disguised as a constitutional workaround. By granting an effective date earlier than what was permitted by § 5110, the plurality's grant of relief either violates, or is at best, in tension with *Arellano*, where the Supreme Court held that we cannot equitably toll a veteran's effective date for benefits. *Arellano v. McDonough*, 143 S. Ct. 543, 546 (2023). The plurality's remedy conflicts with binding case law and has no other legal basis in authority. Even if the government had violated Mr. Taylor's right of access, waiving § 5110 is not an appropriate remedy because doing so is no different from providing an equitable remedy, which the plurality concedes we cannot do.

As the plurality admits, we cannot invoke our equitable powers to give Mr. Taylor an earlier effective date as we would in a traditional statute of limitations case, as discussed in *Swekel*. And as the Supreme Court recently held in *Arellano*, we cannot equitably toll a veteran's effective date for benefits. And as the plurality admits, under *Richmond*, we also cannot order the Veterans Court to equitably estop the government from applying 38 U.S.C. § 5110.

Thus, in the absence of any statutory or equitable power to do so, I would hold that we do not have the authority to grant Mr. Taylor an earlier effective date.

## IV

In an attempt to, understandably, provide Mr. Taylor more fulsome benefits, the plurality's decision inappropriately expands two areas of law. First, it broadens an already amorphous right of access doctrine—which has almost exclusively been applied to incarcerated persons cases or other instances of clear government misconduct that directly result in denied access to institutions—to cover secrecy oaths created in the interest of national

security. Second, it enlarges our court's power by allowing us to craft remedies in the absence of any authority to do so—statutory, equitable, or otherwise. While the plurality attempts to limit its holding to Mr. Taylor's unique case, I am concerned that this case has far-reaching implications that could impact the millions[5] of people with a security clearance or who are prohibited from sharing certain types of national security information. The plurality opinion essentially imposes a balancing test, where national security officials will need to consider whether any security clearances or other means of restricting classified or confidential information could lead to a potential right of access claim. Such a balancing test is a tremendous burden to place on the government.

I sympathize with the plurality's desire to award Mr. Taylor additional benefits, especially given the government's unfortunate treatment of him and other Edgewood volunteers. And I reiterate that Congress should have immediately provided Mr. Taylor with a more complete remedy by passing a statute that would allow Mr. Taylor and other similarly situated veterans to receive benefits dating back to their date of discharge, rather than the date of their benefits application. But Mr. Taylor does not have a cognizable right of access claim, and we have no authority to grant his requested remedy. Therefore, I respectfully dissent.

---

[5]    *See, e.g.*, NAT'L COUNTERINTELLIGENCE AND SEC. CTR., *Fiscal Year 2017 Annual Report on Security Clearance Determinations* at 4 (n.d.), https://www.dni.gov/files/NCSC/documents/features/20180827-security-clearance-determinations.pdf (noting approximately 2.8 million who were briefed into access to classified information in FY 2017).